**Kirt Douglas WAINWRIGHT, Petitioner,**

v.

**Larry NORRIS, Director Arkansas Department of Correction, Respondent.**

No. PB–C–92–211.

United States District Court, E.D. Arkansas, Western Division.

Sept. 29, 1994.

See also, 836 F.Supp. 619.

John W. Hall, Jr., Walter C. Lambert, John Wesley Hall, Jr., P.C., Little Rock, AR, for petitioner.

Olan W. Reeves, Atty. General's Office, Little Rock, AR, for respondent.

## MEMORANDUM OPINION AND ORDER

EISELE, District Judge.

### I. BACKGROUND

On July 29, 1988, at approximately 8:15 p.m., Ms. Barbara Smith, an attendant at the Best Stop in Prescott, Arkansas, was fatally shot once in the top of the head. Nobody saw the actual shooting. Mr. Kirt Wainwright was charged with capital murder for the killing of Ms. Smith.

At Mr. Wainwright's trial, Ms. Lavon Jackson testified that she had stopped at the Best Stop at approximately the same time on the night in question. Before turning to put gas in her car she noticed a black man standing at the end of the counter inside the Best Stop. A little boy came out and told Ms. Jackson that there was a lady on the floor. Ms. Jackson went in, saw Ms. Smith on the floor, and called the police. Ms. Jackson did not recall any specific physical characteristics of the black man that she had seen at the counter. She did recall seeing Mr. Sam Gatlin, a black woman, a white woman, a white man, and the white boy who had first told her about the woman on the floor.

Mr. Sam Gatlin testified that he had also been at the Best Stop at the relevant time. He had pulled up to the Best Stop and let his passenger, Pauline Henagan, out in front of the store. He noticed Octavia Hardamon pulling up at about the same time and then leaving. Mr. Gatlin then drove over to the air pump to get some air in his car tire. He heard someone running down the sidewalk as he filled his tire. He looked up and saw a black man with his hand behind him jump over the air hose, get into a pink Cadillac, and drive off. He could not tell if there were others in the car. Mr. Gatlin pulled around, got some gas, and entered the store with Ms. Jackson. There was a white male in the store who told Mr. Gatlin that there had been a murder, and there was a white boy with the man. Later that night, Mr. Gatlin went to Hope to identify a pink Cadillac as the same one that he had seen at the Best Stop.

Ms. Pauline Henagan testified that she had gone to the Best Stop with Mr. Gatlin that evening. As she entered the store, a young, tall, slim black man was exiting the store. She testified that he was wearing red and white flowered shorts and a red top. He had something behind his back. She testified that when she went in the store, she saw Octavia Hardamon already inside, but that Octavia left at approximately the same time that Ms. Henegan entered the store. Besides herself, Mr. Gatlin, and Ms. Hardamon, Ms. Henegan testified that a white man, a white boy, and a white woman were at the Best Stop that evening. Ms. Henagan later identified a pair of shorts shown to her by the police as the same ones she had seen on the young black man she saw exiting the Best Stop as she entered.

Mr. Donald Ray Geid testified that he and his son John, who at the time was about ten years old, stopped at the Best Stop that night. He saw Sam Gatlin and a woman by

the gas pumps. He went inside with Mr. Gatlin and the woman and discovered Ms. Smith on the floor. He did not see any black males leaving the store before he entered.

Ms. Octavia Hardamon testified that she stopped at the Best Stop that evening to get some candy. She heard a noise while she was looking at the candy, but didn't see anyone. She looked up a few seconds later and saw Kirt Wainwright walking out the door with a black pistol in his hand. She panicked and left the store, passing Pauline Henagan on her way out. Ms. Hardamon returned to the Best Stop later that evening to find out that Ms. Smith had been shot. She then went to the Sheriff's office to give a statement. Ms. Hardamon testified that she had known Mr. Wainwright for a long time, but specifically denied ever having had a relationship or affair with him.

Patrick Flenory, a fourteen-year-old boy, testified that he had been walking past the Best Stop on his way home when he saw Kirt Wainwright running out of the store wearing "clam diggers" of different colors. He knew Mr. Wainwright through family connections, and testified that he had seen Mr. Wainwright's face. Moments later, a pink Cadillac sped past him and he saw Kirt Wainwright in the back seat. He saw two other people in the car. Mr. Flenory then went into the store, where he recalled seeing several people, both black and white, that he did not know. He specifically recalled seeing Mr. Gatlin. He further testified that it was dusk when these events happened.

Ms. Elnora Hopson testified that Kirt Wainwright knocked on her door on the evening of July 29, 1988 as it was beginning to get dark, which she guessed put the time at about 8:30 p.m. Mr. Wainwright was a friend of her grandson's, and he told her that he needed to get some clothes. He went into the bedroom, got his clothes, and left. She estimated that he had been in the house for less than a minute. When asked, "At any time, did you see him go in the bathroom, wash up or anything?", she responded, "No. He got his clothes and went to the car." She described the car as a reddish old model Cadillac.

Mr. Dwight Hopson testified that he stopped in the house where he lived with his grandmother, Elnora Hopson, on July 29, 1988 to change clothes. He noticed a check on the dresser, but didn't think much about it. The next morning he found that there were actually seven or eight checks, and that they had Best Stop on them. He turned them in to the police.

Officer Henry Parmer testified that at 8:23 on July 29, 1988, he was informed by dispatch that there had been an armed robbery at the Best Stop store and to look for a pink Cadillac with fender skirts. He saw the vehicle go by and pulled it over. Three black males were in the car. Andrew Woods was driving, Dennis Leeper was in the passenger seat, and Kirt Wainwright was in the back seat. The car was a two door, with bench seats that folded forward to allow someone to get in the backseat. He saw a money bag, later identified as being from the Best Stop, on the floorboard behind the driver's seat.

Several other officers testified. When apprehended, Mr. Wainwright was wearing the red flowered shorts identified by Ms. Henegan as those on the man she saw exiting the Best Stop. Mr. Woods was wearing a shirt and pants. Mr. Leeper was wearing a scrub shirt and cut-off blue jeans.

When the money bag was removed from the car, a blue .22 Colt revolver fell out. The revolver contained one "spent" casing and was loaded and ready for firing. Although the state expert could not say for certain that the gun found in the car fired the shot that fatally wounded Ms. Smith, the expert testified that the shot was fired from a revolver like the one found in the Cadillac.

Gunpowder residue tests were performed on the three car passengers. Mr. Wainwright and Mr. Woods were "negative." Mr. Leeper showed a significant amount of gunpowder residue on his left hand. More residue was on the back of his hand than on the palm area. Mr. Leeper is right-handed. Mr. Wainwright is left-handed. It appears that Ms. Smith was shot by someone holding a gun in his left hand.

The clothes Mr. Wainwright was wearing when stopped by the police were submitted for testing. No blood was found on the clothing. The clothing of Mr. Leeper and Mr. Woods was not submitted for testing.

Mr. Wainwright, Mr. Woods, and Mr. Leeper were all charged with capital murder. The cases were severed and Wainwright was tried first. He was convicted of capital murder and sentenced to death. Mr. Woods was acquitted, and Mr. Leeper pleaded to a reduced charge of aggravated robbery and received a seventeen year sentence.

Mr. Wainwright's conviction and sentence were affirmed by the Arkansas Supreme Court on May 29, 1990. *Wainwright v. State,* 302 Ark. 371, 790 S.W.2d 420 (1990). The United States Supreme Court denied certiorari on March 4, 1991. *Wainwright v. Arkansas,* 499 U.S. 913, 111 S.Ct. 1123, 113 L.Ed.2d 231 (1991). Mr. Wainwright then sought state post-conviction relief under Ark. R.Crim.P. 37, which was denied without a hearing on January 13, 1992. *Wainwright v. State,* 307 Ark. 569, 823 S.W.2d 449 (1992). Thus, Mr. Wainwright has exhausted his state remedies.

Mr. Wainwright filed a petition for federal habeas relief pursuant to Title 28 U.S.C. § 2254 on April 7, 1992. Hearings were held before this Court on February 24–26, 1993. Post-trial briefing was completed on April 30, 1993. The Court has now considered all of Mr. Wainwright's arguments, and sets forth its analysis and conclusions below.

For ease of reference, the Court has captioned its analysis of each issue by using the language employed by petitioner in his habeas pleadings.

## II. GROUNDS FOR RELIEF

A(1) THE STATE COURTS' REFUSAL TO ALLOW ADEQUATE FUNDS FOR EXPERT PSYCHIATRIC TESTIMONY DENIED PETITIONER DUE PROCESS AND HIS RIGHT TO PRESENT A DEFENSE; ALTERNATIVELY PETITIONER WAS DENIED EFFECTIVE ASSISTANCE OF COUNSEL BASED ON DEFENSE COUNSEL'S FAILURE TO PRESENT SUCH TESTIMONY AND CHALLENGE THE CONSTITUTIONALITY OF THE STATUTORY FEE CAP

Petitioner alleges that the trial court committed error in denying additional funds for

him to hire a psychiatric expert. Alternatively, he argues that the failure to challenge the constitutionality of the statutory fee cap constituted ineffective assistance of counsel.

■ The state hospital evaluated petitioner, and found him to be competent, but suffering from cocaine abuse. Petitioner sought funds to enable him to present the expert testimony of Dr. Doug Stevens, a clinical psychologist, relating to petitioner's cocaine addiction and psychosis. Initially, the Court indicated that it would only allow what it believed to be the statutory maximum of $300. Eventually, the Court authorized a total of $840 for Dr. Stevens' assistance. Thus, petitioner cannot show prejudice as a result of failure of trial counsel to challenge the statutory fee cap as the trial court granted funds considerably in excess of the cap.

■ Dr. Stevens did not testify at the guilt phase of the trial, and defense counsel argued at the close of the evidence at the guilt phase that the trial court's refusal to award the funds needed at an earlier date prevented the defense from utilizing Dr. Stevens at the guilt phase to support a defense of incompetency to stand trial, insanity, or mental disease or defect. (T. 1817).

Dr. Stevens did testify at the penalty phase. He testified as to petitioner's attention deficit disorder. (T. 2041). He testified as to petitioner's cocaine usage and common reactions to heavy usage. (T. 2044–45). He explained that he spent one hour and 40 minutes total with petitioner, but had also reviewed various records and tests in forming his opinions. (T. 2048). He testified that petitioner met the basic requirements of competency. (T. 2054–55). He testified that he thought petitioner was legally sane. (T. 2062). He further stated that had he been assured that he would be paid for the time spent, he would have done a number of things:

Increased assessment as well as going more in depth in terms of getting information from other sources. Trying to contact people who knew him earlier in life, his

family, perhaps teachers in the school system, and other neighbors or anyone who could give me good information on his behavior in previous times. Talking with Dr. Mobley with the Department of Corrections in order to get more information on any files they had and the psychological testing they would have done. And then, spending more time, of course, with the defendant himself, to elicit more of the history in terms of his drug abuse, and then attempting to either substantiate the bad history, or find that it was incorrect. And the testing that would have been done, would have been a full intellectual evaluation using the Wexler Intelligence Scale, and a neuro-psychological evaluation, probably the Halstadt, the Nebraska battery, and some projected testings, such as the schematic apreception test, along with a full MMPI using a recorded rather than having him attempt to read it.

\* \* \* \* \* \*

I don't think there's an issue as to his competency to stand trial. I do think there could have been an issue as to his mental state and the whole issue of temporary insanity in the legal sense at the time of the commission of the offense.

(T. 2077–78). Dr. Stevens also acknowledged that he was not sure that his "testimony would have been relevant in the guilt-innocence [phase] in any case." (T. 2081).

Petitioner presented this issue to the Arkansas Supreme Court on direct appeal, and it is thus properly preserved for habeas review. *Wainwright v. State,* 302 Ark. 371, 378, 790 S.W.2d 420 (1990). The state court noted that under its previous rulings, "the defendant's right to an examination under *Ake* is adequately protected by the examination at the state hospital, an institution which has no part in the prosecution of criminals." *Id.*

The Arkansas Supreme Court summed up the record by noting that the appellant was provided with $840 to pay Dr. Stevens for his evaluation and testimony even though appellant has also been evaluated by the presumptively neutral state hospital. *Id.* at 379, 790 S.W.2d 420. Petitioner argues that although the Arkansas Supreme Court has held that a

defendant's rights under *Ake v. Oklahoma,* 470 U.S. 68, 105 S.Ct. 1087, 84 L.Ed.2d 53 (1985), are normally adequately protected by a state hospital examination, in this particular case the state hospital examination was not adequate, citing Dr. Stevens' testimony.

*Ake* held as follows:

[W]hen a defendant demonstrates to the trial judge that his sanity at the time of the offense is to be a significant factor at trial, the State must, at a minimum, assure the defendant access to a competent psychiatrist who will conduct an appropriate examination and assist in evaluation, preparation, and presentation of the defense. This is not to say, of course, that the indigent defendant has a constitutional right to choose a psychiatrist of his personal liking or to receive funds to hire his own. Our concern is that the indigent defendant have access to a competent psychiatrist for the purpose we have discussed, and as in the case of the provision of counsel, we leave to the State the decision on how to implement this right.

470 U.S. at 83, 105 S.Ct. at 1096.

The Arkansas Supreme Court reiterated its position that a state hospital examination was adequate in *Branscomb v. State,* 299 Ark. 482, 774 S.W.2d 426 (1989). In that case, the state hospital relied upon a history provided by the defendant's mother even though the defendant had left home at the age of 12 or 13. *Id.* at 486, 774 S.W.2d 426. The trial court allowed no funds for additional psychiatric evaluation. *Id.* Nevertheless, the Arkansas Supreme Court found that the state psychiatric examination sufficiently protected the defendant's rights and that there was no error in the trial court's refusal to allow additional funds for additional evaluation.

In the case at bar, Dr. Stevens testified as to additional mitigation investigation that he would have performed and additional tests that he might have performed. He did not, however, testify that the state hospital's evaluation was inadequate. The Arkansas Court found no error.

This Court agrees. *Ake* specifically held that it was up to the state to implement the

required access to psychiatric evaluation. The Arkansas Supreme Court has held that state hospital evaluations are sufficient. There is no merit to petitioner's constitutional claims on this point.

## A(2) BALLISTICS AND FORENSIC EXPERT TESTIMONY

Petitioner next contends that the state trial court denied him adequate funds to secure expert testimony and testing relative to the firearms, the bullets, and the spent casings that the State introduced at trial. The trial court indicated that it would only allow $500 for such an expert. Petitioner also requested funds for an expert to subject the autopsy findings and other forensic aspects of the case to meaningful adversarial testing. Alternatively, petitioner contends that if the issues were not properly presented, counsel's failure to properly present them constitutes ineffective assistance of counsel.

■ Respondent first asserts that this issue was not properly presented to the state courts and is thus procedurally barred.

Petitioner made a specific motion for funds for a ballistics expert prior to trial. (T. 69–70). Prior to swearing the jury, petitioner moved for a continuance on the basis that the funds made available for hiring an expert for trace gun residue were insufficient to retain an expert's services for purposes of evaluation and testimony at trial. (T. 1149).[1] Petitioner moved for an additional $1000 to retain a ballistics expert. (T. 1150). Prior to instructions and argument, petitioner moved for a mistrial on numerous grounds. Among them, petitioner argued as follows:

> ... [W]e proffer the testimony of Dr. Irwin Stone, Dallas, Texas, as a ballistics, firearms expert. Had the court awarded fees at an earlier date, and in the amount requested by the defense, Dr. Stone would have testified on issues of ballistics and

gunshot residue in the guilt-innocence phase.

(T. 1817). The prosecutor responded:

> Funds, though discretionary, have been awarded. Certainly, meet the constitutional standards of *Ake v. Oklahoma* that says, as to Dr. Stone (sic). Of course, there's been no showing that the ballistics reports available from the crime lab are in any way in dispute or questionable, and any testimony from Dr. Stone would show, would provide would be cumulative, and unnecessary.

(T. 1818). The Court denied the motion for mistrial:

> ... [T]he Court approved ... $500.00 for an independent ballistics expert, which at that time was not known to the Court by name ... As to Irwin Stone, the Court to this date has approved a $500.00 amount to be paid to a ballistics expert, and at this time, has never been presented with the person's name until this morning of Irwin Stone, or his charges for his testimony in Court. At the time the Court awarded the $500.00 fee, it was doing so as an advance, having no knowledge whatsoever as to the cost of a ballistics expert ... The Court cannot make a sum available without knowing the amount necessary.

(T. 1818–19).

On direct appeal, these portions of the record were included in the appendix.

In *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.1985), the Eighth Circuit addressed a similar situation. Noting that the issue alleged to be procedurally barred in that case had been raised during trial, although not argued in the brief on direct appeal and not specifically mentioned in the Arkansas Supreme Court opinion, the Eighth Circuit concluded that the Arkansas Supreme Court had followed its regular practice in capital cases of considering on their merits all points properly raised at trial, whether or not argued in the brief on appeal. *Id.* at 262. The Eighth Circuit thus concluded that the Arkansas State Supreme Court had actually passed on

---

1. Petitioner also argued that he should be awarded funds to hire a forensic expert. No proffer of testimony has ever been offered on this issue, and therefore it is impossible for this Court to

determine the possible ramifications of such testimony. This Court does not see this issue as a serious argument, and shall not address it further.

the merits of the federal question that the defendant sought to present on federal habeas corpus, and the issue was not procedurally barred. *Id.*

In this case, the Arkansas Supreme Court concluded its opinion on direct appeal with the following:

> As required by Ark.Sup.Ct.R. 11(f), we have reviewed the entire record for other reversible error and find none. Therefore, we affirm the verdict and sentence of the jury.

*Wainwright,* 302 Ark. at 388, 790 S.W.2d 420. Thus, as the issue of the denial of funds, and the context of counsel's failure to fully inform the court in a timely manner of the necessity of further funds, were both discussed at trial and appended to the appeal, this Court concludes that the Arkansas Supreme Court passed on the merits of the claims and they are not procedurally barred. Accordingly, this Court will address the claim on its merits.

In the instant case, it appears from Dr. Malak's testimony that Ms. Smith was grabbed and restrained from behind and shot in the top of the head at a left to right angle, indicating that the triggerman was holding the gun in his left hand. Mr. Wainwright tested negative for gunpowder residue. His test was performed at approximately 10:00 or 10:15 p.m. on the night in question. (T. 1496). Mr. Leeper tested positive for gunpowder residue on his left hand, and there was more residue on the back of his hand than on the front. His test was performed at approximately 11:15 p.m. on the night in question. (T. 1494).

The state ballistics expert, Mr. Gary Lawrence, testified that when a weapon is fired, a fine mist or vapor, almost as fine as cigarette smoke, lands on the individual's hands who fired the weapon. (T. 1505). He stated that this mist leaves trace elements on the hands. There are three primary ways one can have this residue on their hands. One is either by firing the weapon themselves, two, handling a weapon which has recently been fired, and three, being in extremely close proximity to the weapon at the time it was fired. (T. 1507). He testified that vigorous activity or rubbing could remove the residue. (T. 1508).

He stated that washing with water would remove it. (T. 1508).

During the hearings before this Court, Dr. Irwin Stone testified via telephone. He testified that gunshot residue deposited by a firearm can be easily removed by washing the hands or even rubbing them vigorously. Even normal activity, within three hours, may remove the residue. He testified that he supposed that you could conceive of a way that the back of the hand could rub on the weapon or that the palm of the hand picking up a gun could then transfer it to the back of the other hand, but that "it's a very unlikely scenario that residues would be put on the back of the hand simply from handling a gun." He stated that the most likely way to acquire residue on the back of the hand was by firing a weapon. Dr. Stone further testified that when a person fires a gun, most of the residue will land on the back of the trigger-hand, especially in the web between the thumb and the forefinger. Additional residue would be likely to be on the palm of the hand.

The state's theory was that petitioner was the triggerman, that Mr. Leeper merely handled the recently fired gun, and that petitioner washed his hands at Ms. Hopson's home. The state argued this theory in closing:

> Now, [defense counsel] has presented his defense that Dennis Leeper killed this woman ... Dennis Leeper had gunshot residue on his left hand. And if you will recall Mr. Lawrence's testimony ... it's evidence of firing or handling a recently fired gun. The evidence establishes that Dennis Leeper did one of two things. When Kirt Wainwright went in Big Momma's house to leave the checks and get his other clothes, Dennis Leeper, right front of the car, Kirt Wainwright left rear, reaches around, gets the gun and holds it while he's in the house. Handling a recently discharged firearm. Leeper never had the opportunity to wash his hands or remove that residue. Or the other thing Leeper might have done. He may, either then or at some point in time after the shooting, and before they were apprehended, helped clean up the gun. Got the residue on his hands and removed finger-

prints, blood, flesh particles or whatever from the gun ...

(T. 1892–93).

There is no direct evidence that petitioner washed his hands. Indeed, Ms. Hopson's testimony indicated that he did not. The residue on Mr. Leeper's left hand, according to Mr. Stone's testimony, was much more likely to come from firing a gun than by being handed a gun. If Mr. Leeper had helped clean the gun, residue should have been present on both hands. Furthermore, Dr. Stone's testimony indicates that residue can return to "normal" level within a few hours. Mr. Leeper was not tested until approximately three hours after the murder. If a light coating of residue from handling a recently fired gun were on his hands, it could well have worn off.

Dr. Stone's testimony casts some doubt on the state's theory. Several witnesses saw petitioner leaving the store, and did not indicate that anyone else was with petitioner. However, all of the eyewitnesses appear to have arrived at approximately the same time—just after the murder had taken place. There is no way of knowing what happened before the arrival of the eyewitnesses, or of who else may have been in the store.

■ The evidence of petitioner's guilt of capital murder, even if he was not the triggerman, is overwhelming. The evidence that he was the triggerman is more subject to doubt. While nontriggermen can be sentenced to death, a jury presented with evidence indicating that another party was the triggerperson may well have decided to spare petitioner's life. The import of the testimony of a ballistics expert, such as Dr. Stone, is readily apparent, *see supra*, since it discounts certain explanations by the state's expert and emphasizes that the most likely way for Mr. Leeper to have gotten such residue on his hand was by firing the weapon.

■ It appears to the Court that the trial court attempted to be fair and reasonable in its awarding of fees and funds. The Court originally awarded $500.00 for a psychiatric expert, but eventually approved $890.00 in psychiatric expenditure. The Court indicat-

ed that had trial counsel submitted a proper and timely proffer of testimony, along with estimated costs, such funds may well have been granted. It was incumbent upon counsel to provide such information to the Court to secure such testimony. The failure to do so constitutes ineffective assistance of counsel under the standard set forth by the Eighth Circuit in *Cheek v. United States*, 858 F.2d 1330 (8th Cir.1988):

> A claim of ineffective assistance of counsel must be scrutinized under the two-part test of *Strickland v. Washington*, 466 U.S. 668 [104 S.Ct. 2052, 80 L.Ed.2d 674] (1984). Under *Strickland*, in order to prevail on a claim of ineffective assistance of counsel, a convicted defendant must prove both that his counsel's representation was deficient and that the deficient performance prejudiced the defendant's case. The first part of this test is met when the defendant shows that counsel "failed to exercise the customary skills and diligence that a reasonably competent attorney would [have] exhibit[ed] under similar circumstances." The second part is met when the defendant shows that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different."

858 F.2d at 1336 (citations omitted). *Accord Roberson v. United States*, 901 F.2d 1475, 1478 (8th Cir.1990). A reviewing court is to apply a "strong presumption" that counsel was reasonably effective. *Strickland v. Washington*, 466 U.S. 668, 687, 104 S.Ct. 2052, 2064, 80 L.Ed.2d 674 (1984).

Here, counsel's failure to secure the necessary funds from an accommodating court and the corresponding failure to present very important testimony constitutes deficient performance. Had this testimony been presented, is there a reasonable probability that the result at the penalty phase would have been different? This is a close question.

First, as set forth above, petitioner must prove deficient performance *and* prejudice to establish ineffective assistance of counsel. As this Court views the record, Mr. Wainwright is guilty of capital murder even if he was not the triggerperson. Thus, the failure to present ballistic evidence to the contrary

did not prejudice the guilt phase of his trial. However, as stated above, a jury may well have decided not to impose the death penalty on Mr. Wainwright had it believed that another person was responsible for the fatal shot. Thus, if Mr. Wainwright is able to establish prejudice for the penalty phase of his trial, it is the penalty phase alone which must be overturned.

However, the Court is not convinced that the result would probably have been different if petitioner's attorney had been able to produce Dr. Irwin Stone as a witness and had he testified before the jury as he testified by telephone before this Court.

■ Petitioner argues in the alternative that counsel was ineffective for failing to challenge the fee cap in existence at the time of the trial. As there was no reason to believe that the Arkansas Supreme Court was willing to review its earlier decisions upholding the fee cap, the failure to challenge the cap was not ineffective. Furthermore, the trial court in this case actually awarded fees in excess of those authorized by the statute, and thus petitioner cannot show prejudice for the failure to challenge the fee cap. This issue was presented to the Arkansas Supreme Court under Rule 37, and decided adversely to petitioner. *Wainwright*, 307 Ark. at 575, 823 S.W.2d 449.[2] This Court agrees with the Arkansas Supreme Court's analysis on this particular issue.

### A(3) EXPERT SOCIOLOGICAL TESTIMONY

■ Petitioner also moved for funds for expert sociological testimony in the guilt and penalty phases of the trial. Petitioner states that had funds been allowed, Dr. Robert Sarver, now deceased, a professor of Law and Sociology at the University of Arkansas and former Warden for the Arkansas Department of Correction, would have testified about the death penalty and life in prison without parole and about the potential that an individual serving life without parole has for leading a useful and productive life in prison. Petitioner asserts that such testimo-

ny would have borne directly upon the following mitigating circumstances: 1) that if allowed to live the remainder of his life in prison without parole, Kirt Wainwright may nevertheless be able to make some meaningful contribution or be of some use to society; 2) that if properly confined and treated, Kirt Wainwright is adaptable and can adjust to a prison setting; and 3) that Kirt Wainwright has artistic, poetic, and other talents which could be furthered and possibly put to good use if allowed to remain in prison for the remainder of his life.

Respondent's contention that this issue is procedurally barred is incorrect for the same reasons cited in this Court's discussion of the procedural bar issue in point A.II, *supra*. The issue was raised at trial and appended on appeal and the Arkansas Supreme Court is presumed to have addressed it on its merits.

Petitioner fails to establish a violation of due process on this issue. Dr. Stevens testified to the same mitigating factors listed above. Much of the same sort of testimony was elicited from petitioner's pastor, Reverend Butler. There is no evidence that further testimony from a different expert would have substantially affected the outcome of this case.

■ Similarly, petitioner cannot establish the requisite prejudice for ineffective assistance of counsel on this issue. Petitioner has failed to establish that, had counsel secured such funds and corresponding testimony, there was a reasonable probability that the outcome would have been different.

Petitioner's arguments on this issue are without merit.

### B. PETITIONER WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE STATE COURT'S DENIAL OF HIS MOTION FOR A CHANGE OF VENUE

■ Petitioner contends that the publicity surrounding his trial was such that he could

---

**2.** It appears that the Arkansas Supreme Court considered the ineffective assistance of counsel claim solely as to the failure to challenge the fee cap. It did not consider whether counsel was ineffective for failing to present information to the court to secure funds for a ballistics expert.

588

not and did not receive an impartial jury as required by the Fifth, Sixth and Fourteenth Amendments.

Approximately four months prior to trial, Wainwright filed an Application for Change of Venue. He supported this motion with three affidavits. At the pretrial hearing, he called Lucille Rogers, circulation manager of the Hope Star and John Ragsdale, publisher of the Nevada County Picayune, for the purpose of establishing the circulation figures for their publications.

Of the fifty-two panelists questioned during individual voir dire, six were not questioned as to exposure to pretrial publicity. Of the remaining forty-six, thirty-one indicated some pretrial exposure to publicity. Nine of the jurors actually seated had been exposed to pretrial publicity.

The Arkansas Supreme Court has addressed this issue in this case:

Appellant offered three witnesses in support of his request for a new venue. Two witnesses were associated with area newspapers, and they related the various articles published regarding Smith's murder. However, both witnesses opined that the appellant could obtain a fair trial in Nevada County. It was also shown that most of the publicity surrounding this murder ended about two months prior to the date of trial. While the third witness expressed doubts that the appellant could receive a fair trial in the county, she indicated she could be fair if she was selected as a juror. Most of the jurors admitted to some exposure to pretrial publicity, but on voir dire they all announced they could give the appellant a fair trial. Appellant had the burden of showing that a fair trial is not likely to be had in the county and the trial court's decision on the issue will be upheld unless it is shown the court abused its discretion. *Gardner v. State*, 296 Ark. 41 [754 S.W.2d 518] (1988). Again, appellant failed to meet his burden, and the trial court's ruling must stand.

*Wainwright*, 302 Ark. at 378, 790 S.W.2d 420.

■ It is well settled that the Fifth, Sixth, and Fourteenth Amendments guarantee a criminal defendant the right to an impartial jury. An impartial jury consists of jurors who will conscientiously apply the law as instructed and find the facts. *See Wainwright v. Witt*, 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). The relevant inquiry is whether petitioner can show that the jury had such fixed opinions or preconceived notions or were biased such that they could not judge impartially the guilt or the innocence of the petitioner. *Hobbs v. Lockhart*, 791 F.2d 125 (8th Cir.1986). The defendant is not entitled to a trial before a jury that is composed of people completely ignorant of the crime; in many cases, that would be a virtual impossibility. *Irvin v. Dowd*, 366 U.S. 717, 81 S.Ct. 1639, 6 L.Ed.2d 751 (1961).

■ All of the jurors seated stated that they could give petitioner a fair trial. While that is not dispositive, and should not be blindly accepted, this Court's review of the voir dire in this case fails to demonstrate any evidence that the jurors' statements are not worthy of belief.

■ Petitioner is required to show that the jury was partial. *Dobbert v. Florida*, 432 U.S. 282, 97 S.Ct. 2290, 53 L.Ed.2d 344 (1977). The trial court has a duty to determine whether a juror is actually biased and is given broad discretion on its rulings on challenges for cause. *Dennis v. United States*, 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950).

This Court agrees with the Arkansas Supreme Court that petitioner has failed to meet his burden on this issue.

C. PETITIONER WAS DENIED DUE PROCESS AND A FAIR TRIAL BY THE INTRODUCTION INTO EVIDENCE OF FOUR ALLEGED STATEMENTS WHICH WERE EITHER COERCED, OBTAINED IN VIOLATION OF *MIRANDA*, AND/OR UNDISCLOSED BY THE STATE

Petitioner gave four formal statements to the police between July 29, 1988 when he was arrested and July 31, 1988. The appellant was read his rights upon his arrest and before giving his first statement. He initialed and signed a rights form at about 10:08 p.m. on the night of the crime, July 29, 1988.

This first statement was essentially non-incriminatory, was not introduced at trial, and is not at issue here. At approximately 1:00 a.m. on July 30, 1988, after being shown the previously executed rights form, petitioner gave a second statement. His third statement was given at approximately 5:45 p.m. on July 31, 1988, after executing a second rights form. It was not introduced at trial. The fourth statement was given at approximately 8:45 p.m. on July 31, 1988. The second and fourth statements will be addressed below.

At trial, three other statements made by petitioner were introduced into evidence. These statements were made by petitioner in the absence of interrogation. Petitioner challenges two of these statements on the ground that the State failed to disclose them prior to trial, and one of the statements on *Miranda* and voluntariness grounds. These statements will be addressed separately from the formal statements.

 1. Statement of July 30, 1988
 (The Second Statement)

 2. Statement of July 31, 1988
 (The Fourth Statement)

In the second statement, given at approximately 1:07 a.m. on July 30, petitioner admitted being with Mr. Leeper and Mr. Woods, but denied any knowledge about the murder. It is challenged on *Miranda* and voluntariness grounds.

▪ Petitioner contends that he should have been provided with a new waiver of rights form before the taking of this statement, given some three hours after the execution of the first waiver of rights form. He further contends that this statement was given after being physically abused or beaten by the police during the evening of July 29, 1988.

The fourth statement was by far the most incriminating. It was given at 8:45 p.m. on July 31, 1988, approximately three hours after executing a second waiver of rights form. Petitioner had been in custody for approximately 48 hours at the time of this statement. He states that the failure to provide him with another waiver of rights form, coupled with the alleged physical abuse he had

suffered earlier, renders this statement inadmissible.

A pretrial hearing was held on the issue of voluntariness of the four statements given to the police (T. 125–242) and the trial court ruled that all four formal statements were admissible.

Petitioner did not testify at the suppression hearing, nor did he testify at the guilt phase of his trial. At the penalty phase, he testified that he was physically abused prior to his statements. The Arkansas Supreme Court was presented with these same arguments and found them to be without merit:

 The appellant was read his rights upon his arrest, and before giving his first statement, he initialed and signed the rights form at about 10:08 p.m. on July 29, 1988. On July 30, 1988, at 1:00 a.m., he was shown the previously executed rights form again when he gave his second nonincriminating statement, which read much like his first. Appellant's third statement was more detailed but still was nonincriminating like his first two. Before giving this statement, he executed a second rights form at 5:45 p.m. on July 31, 1988.

 At 8:45 p.m. on July 31, he volunteered his fourth statement, which was the incriminating one. While the appellant did not execute a new rights form, an officer asked him if he remembered what his rights were, and the appellant said yes. Our court, in *Cope v. State*, 292 Ark. 391, 730 S.W.2d 242 (1987), held there is no requirement that the Miranda warnings, when properly given, must be repeated each time the defendant is questioned. Here, the record indicates the appellant was properly advised of his constitutional rights and that his statements were given after a relatively short period of detention and without undue or prolonged questioning.

 Furthermore, on the voluntariness issue, the record shows the appellant was twenty-two years old, had a tenth grade education, and could read and write. According to the police officers' testimony, the appellant appeared to be sober and coherent at the questioning sessions. The police

officers testified that he was not coerced or threatened and that each time the appellant spoke he did so voluntarily, without asking for a lawyer. The appellant, himself, initiated the fourth statement. He asked to speak to Lt. Duvall and voluntarily gave his statement. The appellant was allowed to review his statements, and he crossed out several lines in the fourth statement. Although he did speak to the officers four times, there is no indication that these sessions lasted for a long time. Accordingly, we hold the trial court should be sustained on this issue.

*Wainwright*, 302 Ark. at 380, 790 S.W.2d 420.

■ Factual findings concerning the events surrounding these statements are presumed to be correct, and such factual findings by a state court are binding on a federal habeas court unless the federal court determines that the state court findings lack fair support in the record. *Marshall v. Lonberger*, 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983). Respondent correctly points out that the determination of whether the police beat these two statements out of petitioner was a matter for the trial court to decide at the suppression hearing and the trial court resolved the matter adversely to petitioner. This credibility determination by the state court cannot be attacked in a federal habeas corpus proceeding. *Pittman v. Black*, 764 F.2d 545 (8th Cir.1985). Even thought the ultimate legal question of whether a confession was voluntary is a due process question and not subject to a presumption of correctness, the factual findings underlying the legal determination of voluntariness are presumptively correct. *Miller v. Fenton*, 474 U.S. 104, 106 S.Ct. 445, 88 L.Ed.2d 405 (1985).

The evidence shows that petitioner was given his *Miranda* warnings and executed a written waiver on two separate occasions, both times within approximately three hours of the statements under attack. Nothing corroborates Mr. Wainwright's belated assertion of physical abuse. This Court, granting deference to the state court factual findings, comes to the legal conclusion that the statements did not violate the dictates of *Miranda* and were given voluntarily. Petitioner is not entitled to relief for the admission of these statements.

## 3. AUGUST 8, 1988 ORAL STATEMENT

■ Petitioner also challenges another statement he gave as violative of *Miranda*. On August 8, 1988, the jailers were conducting a weapons search of petitioner's cell with the assistance of inmate trustees. Petitioner was injured during the ensuing altercation. During that scuffle, petitioner said to Officer Tommy Birdsong that "Hell, yes, I killed that white honky woman, but I wish it had been your wife." This statement was admitted in the penalty phase. Petitioner argues that the very form of the statement indicates that it was responsive to a taunting question of some sort from the officers.

The trial court held that no *Miranda* warnings were required because the statement was spontaneous.

The Arkansas Supreme Court addressed this issue as well:

... [A]ppellant challenges the trial court's admission into evidence another statement attributed to him by Johnson, the jail trustee, and Chief Deputy Tom Birdsong. During the penalty phase of trial, appellant testified that he had never said that he had killed the victim. On rebuttal, Johnson and Birdsong related that appellant got angry because his jail cell had been searched, and he had to be restrained. During the scuffle or altercation, appellant said, "I killed the white honky woman and I wish it had been your mother [wife]." Appellant argues appellant's purported remarks were involuntary and should have been excluded because he had not recently been given Miranda warnings. As previously discussed, appellant had been properly given his rights on prior occasions, and as stated in *Cope*, those rights need not be given repeatedly ... Nonetheless, the trial court here concluded the appellant's statements were spontaneous and not the result of interrogation. In this respect we have held that spontaneous, voluntary and unsolicited statements, made when an accused although in custody, is not being interrogated, are admissible ... Thus, we hold the trial court was correct in permitting Johnson's and Birdsong's testi-

mony regarding the spontaneous remarks made by appellant.

*Wainwright,* 302 Ark. at 385, 790 S.W.2d 420 (citations omitted).

Petitioner testified at the penalty phase that he had never said that he killed the victim. Johnson and Birdsong testified in rebuttal. Neither respondent nor the Arkansas Supreme Court raise *Harris v. New York,* 401 U.S. 222, 91 S.Ct. 643, 28 L.Ed.2d 1 (1971), which stands for the proposition that non-*Mirandized,* voluntary statements are fully admissible for impeachment purposes.

This Court agrees that the statement appears to be spontaneous. Even if it were not, under *Harris* there would be no error in admitting the statement in rebuttal. This Court does not credit the claim that the statement was involuntary. Petitioner's argument on this issue is without merit.

## 4. UNDISCLOSED STATEMENTS

Petitioner also claims that he was denied due process by the State's use of two statements which were not disclosed in discovery.

The first of these was introduced through Officer Duvall, who testified that as he was conducting a gunpowder residue test on Wainwright's hands, Wainwright stated that Duvall "would not get anything off [my] hands." (T. 1699). At trial, defense counsel claimed that this statement was not disclosed prior to trial.

The trial court made a credibility determination that defense counsel knew about the statement prior to trial. This determination was upheld by the Arkansas Supreme Court on direct appeal:

It is the trial court's function to resolve such conflicts, and the court determined that the state disclosed the statement as soon as the prosecutor learned about it. We hold the trial court did not abuse its discretion by denying the appellant's motion for mistrial. Furthermore, appellant showed no prejudice since appellant's statement that Duvall would not find any-

thing by the test could also mean the appellant knew he was innocent.

*Wainwright,* 302 Ark. at 383, 790 S.W.2d 420.

This was a matter of credibility for the state courts to decide and cannot be attacked in a federal habeas corpus action. *Pittman v. Black,* 764 F.2d 545 (8th Cir. 1985). State court findings of credibility may only be set aside when the findings lack fair support in the record. *Marshall v. Lonberger,* 459 U.S. 422, 103 S.Ct. 843, 74 L.Ed.2d 646 (1983).

This Court concludes that the state court findings are fairly supported by the record, and relief may not be granted on this issue.

The second statement that petitioner attacks on nondisclosure grounds was made to Robert Johnson, a trustee at the Nevada County Jail, prior to Wainwright's incriminating statement of July 31, 1988. At the penalty phase, in rebuttal, Mr. Johnson testified that he was sitting beside a crying Dennis Leeper when petitioner was brought past them on his way to make his fourth statement. Mr. Johnson testified that petitioner looked Mr. Leeper in the eye and told him, "I'm fixin to send you home. Don't worry, I'm fixin to send you home." (T. 2135).

Petitioner contends that this was not true rebuttal testimony. Furthermore, he contends that Johnson was acting as an agent of the state in this case, and therefore any of Johnson's knowledge is imputed to the State, implicating a duty to disclose.

The Arkansas Supreme Court held on this issue:

The second oral statement was offered by the state during the punishment phase of the trial. The state asserted it learned of this statement only after the appellant testified. Robert Johnson, a trustee at the county jail on a work-release program, approached the prosecutor and told him the appellant had lied when he claimed he signed the statement, implicating himself of the murder, only after he was beaten by the police. Johnson told the prosecutor that he had been posted to guard Leeper, an alleged accomplice, and Johnson claimed that, when appellant was taken to give his final [fourth], statement, incrimi-

nating statement, appellant looked Leeper in the eyes and said, "Don't worry I'm fixing to send you home."

After learning of Johnson's story, the prosecutor offered Johnson as a rebuttal witness. The trial court allowed Johnson to testify stating the prosecutor could not have known what the appellant was going to say during his testimony and that the state's proof was proper rebuttal testimony. The trial court was correct.

*Wainwright,* 302 Ark. at 383–84, 790 S.W.2d 420.

For the same reasons discussed *supra* concerning federal court deference to state court findings of fact where fairly supported by the record, this Court concludes that petitioner is not entitled to habeas relief on this issue.

D. PETITIONER WAS DENIED A FAIR AND IMPARTIAL JURY AND A FAIR TRIAL IN VIOLATION OF THE FIFTH, SIXTH AND FOURTEENTH AMENDMENTS BASED ON THE STATE COURT'S REFUSAL TO EXCUSE JUROR GILLEYLEN FOR CAUSE AND IMPROPER EXCUSAL OF PROSPECTIVE JURORS STEED AND JOHNSON IN VIOLATION OF *WITHERSPOON V. ILLINOIS*

### 1. JUROR GILLEYLEN

Petitioner alleges that he was denied a fair and impartial jury due to the trial court's refusal to excuse Juror Larry Gilleylen for cause after petitioner had exhausted his peremptory strikes.

The Court notes portions of Mr. Gilleylen's voir dire:

DEFENSE COUNSEL: In a case, a capital murder case where particularly like this one where there is a robbery-murder connected, do you feel that if that case was proven to you beyond a reasonable doubt, that life without parole would be an appropriate punishment for your consideration, depending on what the circumstances were?

MR. GILLEYLEN: Well, I believe if the evidence was to the point that there was no, I mean that it was definitely truth, I believe I wouldn't believe life without parole.

DEFENSE COUNSEL: OK, you are saying it would not be severe enough? The punishment?

MR. GILLEYLEN: No, not if sufficient evidence, I mean, you know. I believe in whatever evidence it was, but I think it would just, if no question of doubt that a person done something, then I believe he should pay for his crime.

\* \* \* \* \* \*

DEFENSE COUNSEL: OK. Do you feel that life without parole is an appropriate punishment to be considered in a capital murder case depending on the circumstances?

MR. GILLEYLEN: In certain circumstances.

DEFENSE COUNSEL: So you can visualize a capital murder where life without parole would be appropriate, would be justice, and you can visualize on the other end of the scale a capital murder where the death penalty would be appropriate?

MR. GILLEYLEN: Yes, that's right.

DEFENSE COUNSEL: Both, you would consider both penalties and wait for the facts to tell you which one?

MR. GILLEYLEN: Yes.

DEFENSE COUNSEL: Do you feel that you could listen to the evidence and hold the state to its burden that the death penalty will not be invoked unless they have proved to you beyond a reasonable doubt that the aggravating factors far outweigh the mitigating factors?

MR. GILLEYLEN: Yes.

\* \* \* \* \* \*

DEFENSE COUNSEL: If it was shown to you, without anything more, that there was a murder and a robbery, do you feel you would automatically fall toward the death penalty side?

MR. GILLEYLEN: No, it would depend on the evidence.

DEFENSE COUNSEL: On the facts of the case?

MR. GILLEYLEN: Right.

(T. 978–981).

A criminal defendant is constitutionally guaranteed a fair and impartial jury. U.S. Const. amend. VI. Actual bias is when a juror's state of mind demonstrates that he could not try the case impartially. *See Wainwright v. Witt,* 469 U.S. 412, 105 S.Ct. 844, 83 L.Ed.2d 841 (1985). When the juror can decide the case based upon the evidence presented and the instructions of the judge, there is no violation of the Sixth Amendment right to a fair jury. *Ross v. Oklahoma,* 487 U.S. 81, 108 S.Ct. 2273, 101 L.Ed.2d 80 (1988). The trial court has a duty to determine whether a juror is actually biased and is given a broad discretion on its rulings on challenges for cause. *Dennis v. United States,* 339 U.S. 162, 70 S.Ct. 519, 94 L.Ed. 734 (1950).

With respect to this issue, the Arkansas Supreme Court held:

> Here, the trial court found Gilleylen could reach a fair verdict based upon the evidence, and we are unable to say the trial court erred in doing so.

*Wainwright v. State,* 302 Ark. at 381, 790 S.W.2d 420. This Court agrees. During the extensive voir dire by counsel for Wainwright, Juror Gilleylen indicated that he could render both verdict and sentence based upon the evidence in court. Petitioner has failed to demonstrate constitutional error based upon the trial court's refusal to excuse Juror Gilleylen for cause.

## 2. PROSPECTIVE JURORS STEED AND JOHNSON

██ Petitioner also alleges that the Court's excusal of prospective jurors Steed and Johnson violated his right to a fair and impartial jury. The Court has reviewed the voir dire of both of these prospective jurors. Mr. Steed indicated numerous times that if a defendant took a life, "and if it was proved that they did, well, their life should be tooken (sic), too." (T. 886). Other examples include:

DEFENSE COUNSEL: OK. Then what you are telling me is, that if the state proves their case, or if there was any case proven, and a life has been taken, you would not consider life without parole?

MR. STEED: Probably, not.

\* \* \* \* \* \*

THE COURT: ... I am not trying to change your mind or convince you of anything. If you just believe you can [consider life without parole], and that's as far as you can consider it, then we all need to know.

MR. STEED: I don't really know how to answer.

(T. 887–890). At this point, the trial court excused Mr. Steed for cause.

Ms. Johnson expressed similar reservations about the death penalty:

DEFENSE COUNSEL: ... Now, do you, also, understand that there is an alternative punishment to capital murder, which is life without parole. Do you feel that that is an appropriate punishment for consideration on a capital murder?

MRS. JOHNSON: I am not sure.

\* \* \* \* \* \*

DEFENSE COUNSEL: OK, so what I am asking you, is if a capital murder is proven without regard to the facts, murder during a robbery, do you feel automatically, because a life has been taken during a robbery, that a death sentence should be imposed?

MRS. JOHNSON: Yes.

DEFENSE COUNSEL: OK, so that means that you would be unwilling to consider life without parole?

MRS. JOHNSON: Yes.

(T. 907–908).

Both Mr. Steed and Ms. Johnson wavered somewhat during their answers, but left the distinct impression that, at best, they had a very strong leaning toward the death penalty if the underlying crime was proven. The trial court excused both jurors for cause on its own motion. For obvious reasons, trial counsel did not object to the excusal of either juror.

As a general proposition, a juror may not be challenged for cause based on his views about the death penalty, unless those views would prevent, or substantially impair, the performance of his duties as a juror in accordance with his instructions and his oath. *Adams v. Texas*, 448 U.S. 38, 100 S.Ct. 2521, 65 L.Ed.2d 581 (1980). It is the trial court which must determine whether the juror's views would prevent or substantially impair the performance of his or her duties, and great deference is given to the trial court in making that determination. *Wainwright v. State*, 307 Ark. 569, 576, 823 S.W.2d 449 (1992).

Having reviewed the voir dire of both Mr. Steed and Ms. Johnson, this Court cannot say that the trial court erred in excusing either juror for cause. Furthermore, it is difficult for the Court to see how their excusals could have prejudiced petitioner. Had these same jurors not been excused for cause, petitioner would undoubtedly invoke the same argument that he used for the trial court's refusal to excuse Juror Gilleylen. This Court concludes that there is no merit to this argument.

E. PETITIONER WAS DENIED EQUAL PROTECTION AND A FAIR TRIAL BY THE STATE'S USE OF A PEREMPTORY CHALLENGE TO EXCUSE PROSPECTIVE BLACK JUROR GLADYS BLAKELY FROM THE JURY PANEL WITHOUT GIVING A RACIALLY NEUTRAL EXPLANATION RELATED TO THE CASE AT HAND

Petitioner alleges that the state's use of a peremptory challenge against Gladys Blakely, a black woman, was done in a racially discriminatory manner, contrary to the dictates of *Batson v. Kentucky*, 476 U.S. 79, 90–96, 106 S.Ct. 1712, 1719–23, 90 L.Ed.2d 69 (1986).

Prior to Ms. Blakely, all but one of the black panelists had been excused for cause. Of the nine black panelists individually voir dired, seven were excluded for cause for their views about the death penalty. One black panelist was selected for the jury. Ms. Blakely, the ninth of the black panelists indi-vidually voir dired, was excused by the state after an extensive colloquy concerning her views on the death penalty.

The Court notes numerous statements by Ms. Blakely which indicate that she had a great deal of difficulty with the death penalty:

I'm a Christian, and my Bible always taught me thou shall not kill. I realize anybody do wrong they should be punished, but I don't believe in capital punishment.

\* \* \* \* \* \*

I am willing to apply the law as far as when someone do wrong I know they are supposed to be punished, but as far as the death penalty, I am not sure.

\* \* \* \* \* \*

I feel like it's wrong for anybody to kill somebody, but really, I feel like when you give the death penalty, you are not really punishing them. I feel like they should be punished for it.

(T. 842–845). Ms. Blakely went on to say that she thought there was a possibility that she could impose the death penalty in some cases.

The state submitted Ms. Blakely to the Court for cause because of her views on the death penalty. (T. 850). The Court denied the motion. (T. 852). The state then submitted Ms. Blakely to the Court for cause because she had stated that she might have difficulty in viewing and fully considering graphic evidence. (T. 852). That motion was also denied. (T. 852). The state then excused Ms. Blakely, using one of its peremptory challenges. (T. 853). Defense counsel's response, in full was "Your Honor, I would have the record show Mrs. Blakely is a black woman." (T. 853).

The Equal Protection Clause forbids a prosecutor from using peremptory challenges to exclude otherwise qualified persons from the petit jury solely on account of their race. *Batson*, 476 U.S. 79, 106 S.Ct. 1712. In order to establish an equal protection violation, "a defendant must first establish a prima facie case of purposeful discrimination in selection of the jury panel." *Unit-

ed States v. Battle, 836 F.2d 1084, 1085 (8th Cir.1987). To establish a prima facie case of purposeful discrimination, the defendant must first show that the prosecutor exercised peremptory challenges to remove members of a cognizable racial group from the venire. *Batson*, 476 U.S. at 96, 106 S.Ct. at 1722. The defendant must also show that "these facts and any other relevant circumstances raise an inference that the prosecutor used that practice to exclude the veniremen from the petit jury on account of their race." *Id.* In deciding whether the defendant has made the requisite showing, the trial court should consider all relevant factors. *Id.* For example, a "pattern" of strikes against black jurors on the panel might give rise to an inference of discrimination. *Id.* "... (I)t is important to observe that a prima facie case may be made where relevant circumstances indicate an inference of purposeful discrimination no matter that one or more black persons may remain on the jury." *Battle*, 836 F.2d at 1086. "(U)nder *Batson,* the striking of a single black juror for racial reasons violates the equal protection clause, even though other black jurors are seated, and even when there are valid reasons for the striking of some black jurors." *Id.*

 After a defendant establishes a prima facie case, the burden shifts to the government to "articulate a neutral explanation related to the particular case to be tried." *Batson*, 476 U.S. at 98, 106 S.Ct. at 1724. The mere articulation of a non-discriminatory reason is not always sufficient for establishing a lack of purposeful discrimination. The court should look at all relevant circumstances to determine if the articulated reason is pretextual. For instance, in this circuit "it is well established that the government may not justify peremptory challenges to venire members of one race unless venire members of another race with comparable or similar characteristics, are also challenged." *Reynolds v. Benefield,* 931 F.2d 506, 512 (8th Cir.1991). The court must make a final determination of whether the defendant has established purposeful discrimination. *Batson,* 476 U.S. at 98, 106 S.Ct. at 1723.

 In this case, counsel for Mr. Wainwright failed to make a *Batson* objection. Merely noting that an excused juror is black

does not satisfy counsel's obligation under *Batson.* Furthermore, it is clear that the venireperson was struck because of her views on the death penalty. The Arkansas Supreme Court held:

From these facts, we conclude the appellant failed to establish a prima facie case, but even if he had done so, the state clearly offered a neutral explanation for challenging Mrs. Blakely.

*Wainwright,* 302 Ark. at 382, 790 S.W.2d 420. This Court agrees. There is no merit to petitioner's argument on this point.

F. PETITIONER'S DEATH SENTENCE IS UNCONSTITUTIONAL UNDER THE CRUEL AND UNUSUAL PUNISHMENT CLAUSE OF THE EIGHTH AMENDMENT AND THE DUE PROCESS CLAUSE OF THE FOURTEENTH AMENDMENT BECAUSE IT FAILS COMPARATIVE REVIEW AND WAS IMPOSED AS THE RESULT OF PASSION AND PREJUDICE

Petitioner contends that if his offense is compared to other offenses committed under the same capital murder statute or offenses which were premeditated first degree murders committed since July 3, 1989, the effective date of 1989 Ark. Act 856, one would conclude that his sentence of death must have been arbitrarily and capriciously imposed in violation of the Eighth Amendment and the Due Process Clause of the Fourteenth Amendment.

 Respondent first argues that this issue was not raised on direct appeal, and was only raised in the Rule 37 proceeding under an ineffective assistance of counsel claim, and was thus not properly presented to the state courts, rendering it procedurally barred. The Court notes the following language in the Arkansas Supreme Court's denial of state habeas relief:

This court has committed itself to comparative review of death sentences to assure evenhandedness in the application of the death penalty in this state. *Wilson v. State,* 295 Ark. 682, 751 S.W.2d 734 (1988). Petitioner was afforded this review on appeal; therefore, counsel was not ineffective with respect to securing a comparative review on appeal of petitioner's death sen-

tence with sentences imposed in other murder cases.

*Wainwright,* 307 Ark. at 578, 823 S.W.2d 449. Thus, it is apparent that even if the issue was not properly raised, the state courts dealt with this issue on the merits and it is not procedurally barred.

The Court first notes that the Arkansas Supreme Court has stated that "(a)lthough the words 'comparative review' may not appear in our opinion, such a review has been afforded in every capital case since the practice was made a part of our appellate review process in *Collins v. State,* 261 Ark. 195, 548 S.W.2d 106 (1975) [1977], *cert. denied,* 434 U.S. 878 [98 S.Ct. 231, 54 L.Ed.2d 158] (1977)." *Ruiz & Van Denton v. State,* 280 Ark. 190, 655 S.W.2d 441 (1983). Thus, this Court must begin with a presumption that the Arkansas Supreme Court conducted a comparative review of petitioner's sentence.

Petitioner presents a review of over 100 capital and first degree murder cases which have made it to the Arkansas appellate courts between 1985 and the present with which to compare petitioner's case. Petitioner argues that petitioner's case pales in comparison to other robbery/murder cases in which the death penalty was imposed. Petitioner further argues that the disparity is even more apparent when one compares the sentences of life imprisonment.

 Respondent contends comparative review is not required by the Constitution, and thus the review process performed by the state is not cognizable in habeas corpus review of a state court conviction and death sentence. He states that comparative review is a matter of state law. As a matter of state law, the Arkansas Supreme Court has made it clear that comparative review only applies to cases in which the death sentence is actually given. *Wilson v. State,* 295 Ark. 682, 689, 751 S.W.2d 734 (1988).

This Court concludes that respondent is correct. Even if the Arkansas Supreme Court did not conduct a comparative review of the sentence of petitioner, petitioner would have to demonstrate that this alleged failure constituted constitutional error. He cannot do so. Such a contention has been flatly rejected by the United States Supreme Court. In *Pulley v. Harris,* 465 U.S. 37, 104

S.Ct. 871, 79 L.Ed.2d 29 (1984), the Court noted that a federal court may not issue a writ of habeas corpus absent a violation of the Constitution or laws or treaties of the United States. The Court held that the comparative review of death sentences is not constitutionally required, but is a matter of state law. *Id.*

Merely comparing cases in which the defendant was actually sentenced to death does not seem to be the most effective way of ensuring that the death penalty is not arbitrarily or capriciously imposed. Suppose an inventor developed a machine to separate bad apples from good ones. Now suppose that all of the separated apples are indeed bad, but many bad apples are not separated out and are left in with the good apples. Simply reviewing the separated apples might lead an orchard owner to conclude that this was a useful machine. Looking at the overall result, however, would lead that same orchard grower to conclude that the machine would leave him with a lot of rotten apples.

Similarly, looking only at cases where the death penalty was actually imposed might lead the courts to believe that only those deserving of the death penalty were actually receiving it. But if one were to indicate that other defendants who were equally or more culpable were sentenced to life without parole rather than death, this might lead to the conclusion that the system is not working very well after all. So it is worth observing that the state law system of comparative review, although of considerable value, does not necessarily ensure the evenhanded imposition of society's harshest, and only irrevocable, sanction.

This Court is bound by the decision of the United States Supreme Court, and concludes that it may not grant relief on this issue.

G. PETITIONER WAS DENIED HIS SIXTH AMENDMENT RIGHT TO A JURY THAT REFLECTED A FAIR CROSS–SECTION OF THE COMMUNITY; ALTERNATIVELY, ARK. CODE ANN. § 16–32–103–105 (1987) IS UNCONSTITUTIONAL UNDER THE SIXTH AND FOURTEENTH AMENDMENTS

Petitioner contends that the jury selection system used in Arkansas, which is based

solely upon voter registration lists, systematically excludes black citizens. He further contends that the ratio of blacks to whites in this case failed to reflect a fair cross-section of the community.

Respondent first argues that this issue is procedurally barred. Petitioner responds that this issue was raised by defense counsel during voir dire (T. 611) and renewed again later in the trial. (T. 1135–39). Under Rule 11(f), it was preserved for direct review because the motions and rulings were included in the appendix to the brief and in the list of objections. Respondent's Exhibit A, p. 41, 45.

In *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.1985), the Eighth Circuit addressed a similar situation. Noting that the issue alleged to be procedurally barred in that case had been raised during trial, although not argued in the brief on direct appeal and not specifically mentioned in the Arkansas Supreme Court opinion, the Eighth Circuit concluded that the Arkansas Supreme Court had followed its regular practice in capital cases of considering on their merits all points properly raised at trial, whether or not argued in the brief on appeal. *Id.* at 262. The Eighth Circuit thus concluded that the State Supreme Court had actually passed on the merits of the federal question that the defendant sought to present on federal habeas corpus, and the issue was not procedurally barred. *Id.*

In this case, the Arkansas Supreme Court concluded its opinion on direct appeal with the following:

As required by Ark.Sup.Ct.R. 11(f), we have reviewed the entire record for other reversible error and find none. Therefore, we affirm the verdict and sentence of the jury.

*Wainwright,* 302 Ark. at 388, 790 S.W.2d 420. Thus, as the issue was raised at trial and appended to the appeal, this Court concludes that the Arkansas Supreme Court passed on the merits of this claim and it is not procedurally barred. This Court must also address the claim on its merits.

 Petitioner provides a statistical analysis to demonstrate that the use of voter registration lists as the source for jury selection results in a substantial underrepresentation of blacks in the jury pool. Dr. Berry presented his analysis of the underrepresentation during the hearings before this Court. Petitioner did demonstrate that blacks were disproportionally underrepresented in the jury selection process.

However, subsequent to the hearings in this case, the Eighth Circuit was presented with an opportunity to readdress decisions upholding the use of voter registration lists for jury selection. In *Floyd v. Garrison,* 996 F.2d 947 (8th Cir.1993), this Circuit found no constitutional violation in the practice:

To establish a prima facie equal protection violation, Floyd must show (1) blacks are a "recognizable, distinct class, singled out for different treatment;" (2) blacks were substantially underrepresented in jury pools over a significant period of time; and (3) the jury-selection process is "susceptible of abuse or is not racially neutral." ...

Floyd has failed to establish the third prong of the equal protection test by showing a discriminatory purpose in the jury-selection process ... Floyd concedes there was no intentional discrimination in the random selection of jurors from the voter registration lists, but again contends proportionately fewer blacks register to vote. The use of voter registration lists was intended to eliminate discriminatory and arbitrary selection practices, and Floyd has not shown that blacks are prevented from registering to vote ... Thus, the sole use of voter registration lists to select jury pools does not violate equal protection.

*Id.* at 949 (citations omitted).

This Court is bound by the Eighth Circuit's decision, and thus finds that petitioner has failed to demonstrate a discriminatory purpose in the jury-selection process.

This Court further finds that petitioner has failed to demonstrate that petitioner was denied a fair-cross section of the community from which to select the jury in this case. Petitioner shall not be afforded relief on this claim.

## H. PETITIONER WAS DENIED DUE PROCESS AND A FAIR TRIAL BASED ON POLICE MISCONDUCT IN INDUCING A FACTUALLY INACCURATE STATEMENT FROM OCTAVIA HARDAMON AND TESTIMONY THAT FOLLOWED FROM THAT STATEMENT

At petitioner's trial, Octavia Hardamon (now Gamble) testified that she saw Kirt Wainwright exiting the Best Stop at the time of the murder and that he was carrying a gun in his hand:

Q And when you first saw Mr. Wainwright that evening in the Best Stop, where was he at?

A He was going, he was at the door when I saw him.

Q Going out?

A Yes, sir.

Q Did he have anything in his hands that you could see?

A He had a gun, but he didn't have anything else.

Q Had a, what kind of gun?

A A pistol.

Q Do you know what, can you describe more about what the pistol looked like?

A I didn't see all of it. I just saw a piece of it. It was black.

Q A black pistol?

A Yes, sir.

(T. 1276–1277).

Ms. Hardamon went on to give more specific details of how Mr. Wainwright was holding the gun:

Q And how was he holding this gun?

A Kinda like he was trying to conceal it or something.

Q OK, and how was that? How was he trying to conceal it?

A With his hand, behind his knee.

Q OK, in his hand behind his knee. Which hand?

A Left hand.

Q OK. So he's holding it down real low and going out the door like this?

A No, sir.

Q That's not right?

A That's not right.

Q OK, how. Could you show the jury?

A Kinda like this.

Q OK, what was I doing wrong? Holding it out and he had it in like that?

A He had it in.

Q OK, so he's got it between his hand and his leg and you can see a little piece of it. Are you absolutely, 100% sure that that was gun that you saw in Kirt's hand?

A Yes, sir.

(T. 1280).

Ms. Hardamon was questioned extensively as to whether she had any reason to be biased against Mr. Wainwright:

Q ... Mrs. Hardamon, would you have any reason to be biased, or slant your testimony against Kirt Wainwright?

A No, sir.

Q You said you all had a disagreement before.

A Yes, sir.

Q Do you want to tell the jury what that was about?

A It was over some money I was supposed to have owed him, but I didn't.

Q OK. Isn't it, also, true you and your husband and Kirt were involved in a pretty serious disagreement?

A Yes, sir.

Q Isn't it true that your husband confronted Kirt and made him admit in front of you, that you all had had an affair while he was gone?

A No, sir.

Q You are under oath.

A No, sir, that's not true.

(T. 1283).

Ms. Hardamon was later called back to the stand. Again, she was asked about her relationship with Mr. Wainwright:

Q OK, but again Mrs. Hardamon, we are operating under strict rules, my question is, do you deny saying that the

other day, that you had no reason to be biased against Mr. Wainwright?

A I didn't say that.

Q OK, then you deny it?

A Uh, huh.

Q You, also, denied having a relationship with Kirt, isn't that right?

A Yes, sir.

Q That is still your testimony today?

A Yes, sir.

Q Do you know Sheila Butler, Mrs. Hardamon?

A Yes, I do.

 * * * * * *

Q Do you deny telling Mrs. Sheila Butler about having a relationship with Kirt?

A Yes, sir.

Q You did not tell her that?

A No, sir.

Q Do you deny having a relationship with Kirt prior to being married?

A I haven't had one with him.

Q Never?

A Just good friends.

Q OK. Do you deny meeting Kirt at Mrs. Butler's house under circumstances that would indicate more than just friends?

A No, sir.

Q Do you deny, strike that please. Do you deny telling Mrs. Butler about that relationship prior to your marriage?

A No, sir, we didn't have one.

Q I am asking you do you deny telling Mrs. Butler.

A I didn't tell her anything.

Q About a relationship prior to your marriage?

A No, sir.

Q OK, you deny that.

A Yes, sir.

(T. 1735–37).

Immediately following this exchange, Ms. Hardamon was again questioned about her testimony that she had seen a gun in Mr. Wainwright's hand as he exited the Best Stop:

Q ... Mrs. Hardamon, do you deny telling Mrs. Butler about your being there at the Best Stop on July 31st?

A No, I don't.

Q You have talked to her about that?

A I mentioned it.

Q Beg pardon?

A I. mentioned it.

Q OK. On how many occasions.

A Oh, about once or twice.

Q OK. At least a couple of times?

A Yes, sir.

Q Mrs. Hardamon, do you deny that you have told Mrs. Butler that you did not really see Kirt Wainwright with a gun.

A Excuse me?

Q Do you deny telling Mrs. Butler that you did not really see a gun with Kirt Wainwright?

A I didn't say that.

Q You deny telling her that?

A Yes, sir.

Q All right. Do you deny telling her that you only saw Kirt Wainwright with his hand hidden as though he was hiding something?

A No, sir, I didn't say that either.

Q OK. Do you deny telling Mrs. Butler when she questioned you about those statements about the gun, you deny telling her well, the newspaper said he had a gun anyway?

A No, sir, I didn't say that.

(T. 1739–1740).

After recalling Ms. Hardamon, Ms. Sheila Butler was called to the stand to impeach Ms. Hardamon's testimony on these two issues:

Q Mrs. Butler, have you talked to Mrs. Hardamon about what she saw at the Best Stop back last July?

A Yes.

Q I would like to ask you certain things, and see, do you have any personal knowledge, or have you had conversa-

tions with Mrs. Hardamon regarding these things? You said she has discussed what she saw there at the Best Stop?

A Uh, huh.

Q Did she tell you anything about seeing a gun?

A Huh, huh. She just said that the man was going out of the store, she told me it was Kirt. That it looked like he was hiding something behind his left leg, and she stood up and put her hand like that, but she said she couldn't testify whether it was a gun, because she couldn't see it. Said it was hidden behind the leg.

Q OK. Did you....

A Because I asked her was it a gun.

Q And she said she could not testify because she couldn't see?

A Huh, huh. She said she, if it was, she said she couldn't describe nothing.

Q All right. When did this discussion take place?

A It was the Wednesday after the robbery.

Q OK. And what were the circumstances of that discussion?

A She was at work and she called me and asked me what was I doing, and I told her I wasn't doing anything, and she asked me could she come out to the house, and I told her yea. And I said, what's wrong, and she said I know something. I said what do you know, she said I know a lot, so I said well, come on, and she came out to the house and we went back to the bedroom and she laid down on one, I have two beds in one room, and I laid down on the other and we started talking, and she said she needed to tell me something. That she was a key witness at the robbery ...

\* \* \* \* \* \*

A Well, she said she was looking at the candy and she thought she heard something, like some steps or some noise, and she kept looking around in the store, and she couldn't see any-

thing at first, so when she turned around, she saw somebody walking out the door. She said she didn't see their face, but whoever it was, they was wearing like a hat with the bib turned to the back, and they had some glasses on. And she said they had a tank top on, and it was a pair of shorts, and she said it was Kirt Wainwright. She said it looked like he was hiding something behind his left leg with his left hand, covering whatever he was hiding.

Q OK. She told you specifically she could not testify it was a gun, because she didn't see it?

A Uh, huh ...

\* \* \* \* \* \*

A She said, well, if he didn't kill that woman, why did he have that gun? And I said, well, you told me he didn't have a gun that you could testify to, I said so, you know, what are you talking about, and she said, well, they had it in the paper that he ran out of the store with a gun, and I said yea, but you don't testify to what you saw, or are you gonna testify to what they had in the paper, and she said, oh, I'm not testifying to what I saw, because I really didn't see a gun. I just know he was hiding something.

\* \* \* \* \* \*

Q Mrs. Butler, do you know from personal knowledge if Kirt and Mrs. Hardamon have ever been more than friends?

A Uh, huh.

Q How do you know that?

A Well, she told me once. She told me one thing, about he come over to her trailer one night while her husband was gone to summer camp, and it was back, I think in July. He was gone for two weeks, and he come over to the trailer, and she told him that they couldn't stay there, because there was people around and they could see them, and they got in her car and they drove off. Anyway, they had, you

know a good time. She told me they had sex together.

Q She told you that?

A Yes, she told me that, and that's not the only time. I tell you she and Kirt have been going together for a long time.

Q OK, how far back have they gone together?

A High school.

Thus, Octavia Hardamon testified that she saw a gun in Mr. Wainwright's hand as he exited the store, and she testified that she had never had a romantic relationship with Mr. Wainwright.

Ms. Butler, a friend of Octavia's and an aunt (by marriage) to Kirt, testified that Octavia had engaged in an extended romantic relationship with Kirt and that Octavia had told her that she did not see a gun in Mr. Wainwright's hand on the evening in question.

During the hearings before this Court, Ms. Hardamon recanted some of her trial testimony and admitted that she had perjured herself. She acknowledged that she had been romantically involved with Mr. Wainwright, that the relationship did not end in an amiable manner, and that her husband and Mr. Wainwright had had an angry confrontation over Ms. Hardamon and Mr. Wainwright's affair shortly before the murder of Ms. Smith. Thus, Ms. Butler's testimony on that point is shown to be true, and Ms. Hardamon is shown to be a perjurer.

Ms. Hardamon is the only person at the crime scene to place a gun in Mr. Wainwright's hand. Ms. Butler attempted to impeach Ms. Hardamon's testimony on that issue as well. In light of the gunpowder residue evidence (residue on Mr. Leeper's hand but not on petitioner's) (See A.2, *supra*), Ms. Hardamon's testimony was extremely important to support the State's theory that Mr. Wainwright was the triggerman in Ms. Smith's murder.

 Mr. Wainwright contends that he is entitled to habeas relief based upon this newly discovered impeachment evidence. A claim of newly discovered evidence relevant to the guilt of a state prisoner is generally not a ground for relief on federal habeas corpus. Such evidence constitutes a ground for relief only where it "bears upon the constitutionality of the petitioner's detention." *Byrd v. Armontrout,* 880 F.2d 1, 8 (8th Cir. 1989), *cert. denied,* 494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990). "(R)elief will not be granted unless it can be shown that the [newly discovered] evidence would probably produce an acquittal on retrial." *Dumond v. Lockhart,* 885 F.2d 419, 421 (8th Cir.1989). "Recanted testimony ... is grounds for relief from a conviction when it bears on a witness's credibility or directly on the defendant's guilt." *Lewis v. Erickson,* 946 F.2d 1361, 1362 (8th Cir.1991).

Mr. Wainwright contends that although evidence of his overall participation in the criminal scheme may be substantial, the proof that he was the actual gunman is far less compelling. Therefore, he argues, Octavia Hardamon's perjury is sufficiently significant to demonstrate that on retrial, Mr. Wainwright would probably not have received the death penalty.

This Court finds that petitioner has not fulfilled his burden. He has demonstrated that there is a possibility that, in light of Ms. Hardamon's perjury, a jury might have concluded that Mr. Wainwright was not the triggerman and might have concluded that a sentence of life without parole was appropriate. He has not, however, demonstrated that this newly discovered evidence "would probably" produce a sentence of life without parole. This Court can therefore not grant relief on this basis.

I. PETITIONER IS ACTUALLY INNOCENT OF CAPITAL MURDER, AND THE EVIDENCE IS INSUFFICIENT TO SUPPORT THE CONVICTION AND THE DEATH PENALTY

Petitioner contends that his conviction for capital murder should be set aside because the evidence is constitutionally insufficient to support it.

 The standard of review of sufficiency of the evidence of a petitioner's state trial in a federal habeas corpus case is found

in *Jackson v. Virginia*, 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979):

> [A] federal habeas corpus court faced with a record of historical facts that support conflicting inferences must presume—even if it does not affirmatively appear in the record that the trier of fact resolved any such conflicts in favor of the prosecution and must defer to that resolution.

*Id.* at 326, 99 S.Ct. at 2793.

A federal habeas court determines based upon the trial transcript whether any rational jury could have found the petitioner guilty beyond a reasonable doubt. *Id.* This Court reviewed the trial testimony, and set forth a brief synopsis of that testimony at the beginning of this opinion. This Court concludes that a rational jury could have found the petitioner guilty beyond a reasonable doubt of capital murder.

At the penalty phase, the jury found three aggravating circumstances, all of which were factually supported. Petitioner has also failed to show that no rational jury could have found the petitioner guilty of the death penalty. *See Sawyer v. Whitley*, —— U.S. ——, 112 S.Ct. 2514, 120 L.Ed.2d 269 (1992).

This Court concludes that there is no merit to petitioner's arguments under this heading.

**J. PETITIONER'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS WERE VIOLATED BY IMPROPER COMMENTS MADE BY THE STATE IN CLOSING ARGUMENT**

Petitioner challenges three separate remarks made by the State during closing argument at the penalty phase. Defense counsel objected and moved for a mistrial after each of the three remarks. Petitioner argues that the denial of these motions violated his rights under the Eighth and Fourteenth Amendments.

The first of the challenged comments is: "You are not sentencing this man to death. You, you did not make his bed." This statement occurred in the following context:

> THE STATE: I don't want you all to be misled about your role, in this trial. I have said from the beginning, and I mean it from the bottom of my heart. This is the most important because it is the buffer between unjust charges and people going to the pen. The most important part of this system, but it is only one part of the system, and all of you do (sic) is find the facts. Find the true facts from the accusations. It's very important to find those facts and fit them to the law. The Judge decides what the law is. We decide how to put on the case, and you decide what the facts are, but you are not what you hear (sic). You are not sentencing this man to death. You, you did not make his bed.
>
> DEFENSE COUNSEL: Your Honor. May we approach?
>
> THE STATE: He put a bullet in Barbara Smith, not you.
>
> THE COURT: You may object.
>
> THE STATE: He is the one who got himself here.
>
> DEFENSE COUNSEL: Objection, Your Honor.
>
> THE STATE: None of you.
>
> THE COURT: Overruled.

(T. 2171).

Petitioner states that the statement objected to is violative of *Caldwell v. Mississippi*, 472 U.S. 320, 105 S.Ct. 2633, 86 L.Ed.2d 231 (1985), which prohibits prosecutors from attempting to lessen "awesome responsibility" of determining whether a defendant shall live or die. *Caldwell* concerned a closing argument where the state told the jury:

> [Defense counsel] said "Thou shall not kill." If that applies to [the defendant], it applies to you, insinuating that your decision is the final decision and that they're gonna take Bobby Caldwell out in the front of this Courthouse in moments and string him up and that is terribly, terribly unfair. For they know, as I know, and as Judge Baker has told you, that the decision you render is automatically reviewable by the Supreme Court. Automatically, and I think it's unfair and I don't mind telling them so.

*Caldwell*, 472 U.S. at 325–26, 105 S.Ct. at 2638. Thus, *Caldwell* concerned an argu-

ment where the state told the jury that, subsequent to their decision, the state supreme court would review the matter and made it appear that the jury verdict lacked finality. Here, the State did not in any way imply that the jury's responsibility for making a final decision was less than it is. The State pointed out that the jury was not responsible for the defendant finding himself in a position where the death penalty might result. The State pointed out that the jury was not responsible for what happened before the trial; the State did not argue that the jury was not responsible for what happened to the defendant after the trial. It is thus distinguishable from *Caldwell.*

 The second statement that petitioner objected to was as follows:

> THE STATE: [Defense counsel] said [Wainwright] could set a good example for young people. Get up there and tell the, I got on cocaine and went and murdered this woman. I am a, let me tell you about it. There's no better example for young people than to say Kirt Wainwright got on cocaine. He went and murdered this woman, and he died for it. That's a good example. That's the kind of example that the State of Arkansas wants to set for them.

(T. 2189).

The third statement under attack was as follows:

> THE STATE: So retire and deliberate, and return the only proper verdict in this case. If this isn't a case for the death penalty in Nevada County, Arkansas, there never will be one.
>
> DEFENSE COUNSEL: Judge, that's improper argument.
>
> THE STATE: I pray there will never be one.

(T. 2194).

Petitioner contends that both of these statements were improper because they amounted to an improper expression of personal opinion by the prosecutor and an improper invocation by him of his expertise to suggest the special seriousness of the crime.

 What standard must we apply in evaluating petitioners' attacks on the prosecutors' closing arguments? As stated by the Eighth Circuit in *Newlon v. Armontrout:*

> In analyzing the prosecutor's closing remarks, we must apply the standard articulated by this court in *Hamilton v. Nix,* 809 F.2d 463 (8th Cir.) (en banc), *cert. denied,* 483 U.S. 1023, 107 S.Ct. 3270, 97 L.Ed.2d 768 (1987). As this court has recognized, in a section 2254 habeas corpus proceeding, a federal court's review of alleged due process violations stemming from a state court conviction is narrow. *Id.* at 470. Not every trial error that might result in reversal of a federal conviction on direct appeal would mandate the same result in a section 2254 review of a state court conviction, where we may consider only errors of constitutional magnitude. *See Darden v. Wainwright,* 477 U.S. 168, 182–83, 106 S.Ct. 2464, 2472, 91 L.Ed.2d 144 (1986). The petitioner must show that the alleged improprieties were "so egregious that they fatally infected the proceedings and rendered his entire trial fundamentally unfair." *Moore v. Wyrick,* 760 F.2d 884, 886 (8th Cir.1985). Under this standard, a petitioner must show that there is a "reasonable probability that the error complained of affected the outcome of the trial—i.e., that absent the alleged impropriety, the verdict probably would have been different." *Hamilton,* 809 F.2d at 470; *see Tucker v. Kemp,* 802 F.2d 1293, 1295–96 (11th Cir.1986), *cert. denied,* 480 U.S. 911, 107 S.Ct. 1359, 94 L.Ed.2d 529 (1987).
>
> We cannot agree with the State's argument that the district court's use of both eighth amendment and fourteenth amendment analysis somehow renders its decision improper. Rather, we find that the eighth amendment analysis bolstered the district court' finding of a due process violation. As the Tenth Circuit has stated, "[a] decision on the propriety of a closing argument must look to the Eighth Amendment's command that a death sentence be based on a complete assessment of the defendant's individual circumstances, *see Brooks v. Kemp,* 762 F.2d 1383, 1406 (11th Cir.1985) (en banc), *vacated on other grounds,* 478 U.S. 1016, 106 S.Ct. 3325, 92

L.Ed.2d 732 (1986), and the Fourteenth Amendment's guarantee that no one be deprived of life without due process of law, *see Darden*, [477] U.S. [at 182–83], 106 S.Ct. at 2472." *Coleman v. Brown*, 802 F.2d 1227, 1239 (10th Cir.1986), *cert. denied*, 482 U.S. 909, 107 S.Ct. 2491, 96 L.Ed.2d 383 (1987).

885 F.2d 1328, 1336 (8th Cir.1989).

Petitioner has failed to convince this Court that the statements under attack fatally infected the proceedings and rendered the entire penalty phase unfair. This Court concludes that petitioner should not be granted relief on this issue.

### K. THE STATE'S USE OF THE AGGRAVATING CIRCUMSTANCE THAT THE CAPITAL MURDER WAS COMMITTED FOR THE PURPOSE OF AVOIDING OR PREVENTING AN ARREST OR EFFECTING AN ESCAPE FROM CUSTODY (ARK.CODE ANN. § 5–4–604(5) (1987)) VIOLATED PETITIONER'S RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS

 Petitioner contends that the use of "murder for the purpose of avoiding or preventing an arrest or effecting an escape from custody" as one of three aggravating circumstances in this case was unconstitutional for a variety of reasons. First, petitioner argues that the aggravating circumstance is vague and overbroad, both facially and as applied in this case. This Court disagrees, and finds that this aggravating circumstance is sufficiently specific to guide the jury in exercising its discretion.

 Petitioner next argues that reliance on this aggravating circumstance is unconstitutional under the Eighth and Fourteenth Amendments because the it fails to narrow the class of robber-murderers who are eligible for the death penalty.

Petitioner was charged and convicted of capital murder for "wilfully, unlawfully, and feloniously, acting alone or with one or more other persons, commit or attempt to commit robbery and in the course of and in furtherance of the felony, or in immediate flight therefrom, he or an accomplice caused the death of a person, Barbara Smith, under circumstances manifesting extreme indifference to the value of human life." Petitioner contends that arguing that Wainwright killed Smith in the course of a robbery in order to avoid arrest for killing Smith in the course of a robbery is circular and impermissibly overlaps the issue of guilt with the aggravating circumstance alleged.

This Court recently addressed this issue in *Ruiz and Denton v. Norris*, 868 F.Supp. 1471 (E.D.Ark.1994):

Petitioners' third argument is considerably more complicated. They allege that the submission of an aggravating factor of murder for the purpose of avoiding or preventing arrest impermissibly overlaps with the underlying conviction for committing the murder in the commission of a robbery and/or kidnapping or in the immediate flight therefrom. Petitioners contend that murder in flight from robbery and/or kidnapping, in this case, was the same as murder to avoid arrest and that the use of the murder to avoid arrest aggravator created a "double counting" situation which did not sufficiently narrow the class of murderers subject to the death penalty.

\* \* \* \* \* \*

Based upon the instructions given to the jury in this case, the Court does not find that the conviction for murder in the course of a robbery and/or kidnapping or in the immediate flight therefrom overlaps with the aggravating factor of murder for the purpose of avoiding arrest. The "in the immediate flight therefrom" component of the conviction for murder in the course of a robbery and/or kidnapping or in the immediate flight therefrom is a temporal element. It proscribes the time frame during which the murder must have taken place in order to associate it with the felony in order to constitute felony murder. There is no purpose or intent element to "in the immediate flight therefrom." For example, a person could be charged with murder in the course of a robbery or the immediate flight therefrom if, fleeing the scene of a robbery in an automobile, he

accidently struck and killed a passing pedestrian.

The aggravating factor of murder for the purpose of avoiding or preventing arrest, on the other hand, has a purpose or intent element. It is something beyond a killing during the course of a proscribed felony under circumstances manifesting extreme indifference to the value of human life. And because it does add an intent factor to the general felony murder, it does suffice to narrow the class of robber-murderers eligible for the death penalty. Thus this Court concludes that a conviction for murder in the course of a robbery and/or kidnapping, augmented by an aggravating factor of murder for the purpose of avoiding or preventing an arrest, does not constitute "double-counting."

The Court finds its analysis in *Ruiz* to be applicable to this case, and does not find impermissible overlap.

■ Petitioner also argues that there is an impermissible elevation of the required mental state in that petitioner was convicted of killing "under circumstances manifesting extreme indifference to the value of human life" and then, at the penalty phase, the jury found that petitioner acted with specific intent by finding that he committed the murder to avoid arrest. This Court fails to see the logic of this argument. For the reasons quoted in the *Ruiz* opinion, *supra,* this Court concludes that the added purpose element, far from being impermissible, is what enables this aggravating factor to perform its narrowing function.

■ Finally, petitioner argues that there was insufficient evidence in this case to prove that petitioner murdered for the purpose of avoiding arrest. This Court has previously analyzed the circumstances under which this aggravating factor of murder to avoid arrest could be properly applied, and the evidence in this case would bring this crime into the constitutionally applied realm. In *Woodard v. Sargent,* 567 F.Supp. 1548 (E.D.Ark.1983), this Court agreed with the reasoning in *Pickens v. Lockhart,* 542 F.Supp. 585 (E.D.Ark. 1982). In *Pickens,* eight people were killed execution-style after a robbery and rape.

None of the murders were committed while the felons were actually in the act of fleeing from, or escaping from, police custody. 542 F.Supp. 585. *Pickens* noted that the Arkansas Supreme Court has consistently held that the aggravating circumstance of preventing an arrest or escaping from custody applies where "a robber makes the cold-blooded calculation that by annihilating his victim he thereby eradicates an eyewitness to his crime." *Pickens v. State,* 261 Ark. 756, 551 S.W.2d 212 (1977).

The single gunshot, point-blank, to the top of the victim's head in this case is indicative of a robber's "cold-blooded calculation that by annihilating his victim he thereby eradicates an eyewitness to his crime." This conclusion is bolstered by testimony that Mr. Wainwright had made at least two recent attempts to cash a forged check at the Best Stop when Ms. Smith was working, and he was aware that Ms. Smith could probably identify him.

This Court thus concludes that petitioner has failed to meet his burden on this issue.

## L. THE AGGRAVATING CIRCUMSTANCE OF MURDER COMMITTED FOR PECUNIARY GAIN IS OVERBROAD IN VIOLATION OF THE EIGHTH AND FOURTEENTH AMENDMENTS

■ Petitioner contends that it is constitutionally impermissible to base a death sentence on an aggravating circumstance which merely repeats an element of the underlying crime, since doing so fails to serve the Eighth Amendment's narrowing function. *Collins v. Lockhart,* 754 F.2d 258. Thus, he argues that the use of the aggravating circumstance of murder for pecuniary gain to enhance a conviction for murder in the course of a robbery is impermissible.

In *Collins v. Lockhart,* 754 F.2d 258 (8th Cir.), *cert. denied,* 474 U.S. 1013, 106 S.Ct. 546, 88 L.Ed.2d 475 (1985), the Eighth Circuit held that the aggravating factor of murder for pecuniary gain was, by definition, duplicative of murder in the course of a robbery and thus failed to perform the aggravating factor function of narrowing the class of murderers eligible for the death pen-

alty. The decision was based upon the Arkansas statutory scheme, which allows a conviction for capital murder where the defendant committed murder during the course of a robbery or the immediate flight therefrom **under circumstances manifesting extreme indifference to the value of human life.** *Id.* Subsequent to the *Collins* decision, the United States Supreme Court issued the decision of *Lowenfield v. Phelps,* 484 U.S. 231, 108 S.Ct. 546, 98 L.Ed.2d 568 (1988). The Court analyzed a Louisiana statute which defined first degree murder as, among other things, the killing of a human being "[w]hen the offender **has specific intent to kill or to inflict great bodily harm** upon more than one person." *Id.* at 242, 108 S.Ct. at 553 (emphasis added) (citations omitted). One of the statutory aggravating factors in the Louisiana scheme, and the only one found by the jury in *Lowenfield,* was that "the offender knowingly created a risk of death or great bodily harm to more than one person." *Id.* at 243, 108 S.Ct. at 554 (citations omitted). The petitioner alleged that the parallel nature of these provisions required that his sentences be set aside.

The Court went through an extensive analysis of the role of aggravating circumstances. Reiterating the fact that, to pass constitutional muster, a capital sentencing scheme must "genuinely narrow the class of persons eligible for the death penalty and must reasonably justify the imposition of a more severe sentence on the defendant compared to others found guilty of murder," the Court found that the Louisiana capital sentencing scheme sufficiently narrowed the class of murderers at the guilt phase, by requiring specific intent to kill. *Id.* at 243–45, 108 S.Ct. at 554–555. The Court found that the narrowing of the class of murderers eligible for the death penalty required by the Constitution need not occur through aggravating circumstances if the jury finding of guilt responds to this concern. *Id.* at 245, 108 S.Ct. at 555.

> The fact that the sentencing jury is always required to find the existence of an aggravating circumstance in addition is no part of the constitutionally required narrowing

process, and so the fact that the aggravating circumstance duplicated one of the elements of the crime does not make this sentence constitutionally infirm. There is no question but that the Louisiana scheme narrows the class of death-eligible murderers and then at the sentencing phase allows for the consideration of mitigating circumstances and the exercise of discretion. The Constitution requires no more. *Id.* The Court clearly and explicitly relied upon the heightened intent standard in the Louisiana statutory scheme's definition of first degree murder in making its decision.

After *Lowenfield* was decided, the Eighth Circuit re-examined its holding in *Collins*[3]:

> *Collins* construed a state sentencing system indistinguishable in any significant detail from Louisiana's. Like Louisiana, Arkansas has defined a specific group of crimes as capital murder eligible for the death penalty ... A comparison of Arkansas's definition of capital murder and Louisiana's definition of first degree murder reveals that despite some variations they both perform the function of defining or limiting those crimes eligible for the death penalty. That the Louisiana statute requires the felony murder to be intentional, whereas the Arkansas statute requires only that the murder be the result of extreme indifference to human life, does not significantly distinguish the Arkansas statute from Louisiana's under the *Lowenfield* analysis, because both serve to narrow the class of death eligible murderers from all murderers.

*Perry v. Lockhart,* 871 F.2d 1384 (8th Cir. 1989). To date, the United States Supreme Court has not examined the double counting issue in a state statutory scheme which does not require intent to kill as a prerequisite for capital murder. In *Lockhart v. Fretwell,* —— U.S. ——, 113 S.Ct. 838, 122 L.Ed.2d 180 (1993), the respondent urged the Court to decide whether *Collins* was still good law in spite of *Lowenfield* as a threshold question. *Id.* at ——, 113 S.Ct. at 843. Because the premise that the overruling of *Collins* by *Perry* was proper was presumed by the ques-

---

**3.** The *Collins* decision is neither mentioned nor cited in the *Lowenfield* decision.

tion presented and in the granting of certiorari, the Court declined the invitation to address the belated argument. *Id.* at n. 4.

The Supreme Court indicated that it was inclined to examine the issue when it granted certiorari in *Tennessee v. Middlebrooks,* — U.S. ——, 113 S.Ct. 1840, 123 L.Ed.2d 466 (1993). The Tennessee Supreme Court reversed a conviction of a defendant found guilty of murder in the course of a robbery under circumstances manifesting indifference to human life and sentenced to death after the jury found an aggravating factor of murder for pecuniary gain. *State v. Middlebrooks,* 840 S.W.2d 317 (Tenn.1992). The State court distinguished *Lowenfield* due to the failure of the Tennessee statute, which is virtually identical to the Arkansas statute, to narrow the class of death eligible offenders at the guilt stage. *Id.* After granting certiorari, the Court dismissed the case, stating only that certiorari had been "improvidently granted." *Tennessee v. Middlebrooks,* — U.S. ——, 114 S.Ct. 651, 126 L.Ed.2d 555 (1993). The United States Supreme Court thus allowed the Tennessee Supreme Court decision to stand.

This Court is inclined to agree with the Tennessee Supreme Court. It believes that this issue should be re-examined either by the Eighth Circuit or the United States Supreme Court. However, this Court is bound by the holdings of the Eighth Circuit, and, at this time, *Perry,* and not *Collins,* is the law in this Circuit. Accordingly, the Court is foreclosed from granting relief on this issue.

## M. THE ARKANSAS CAPITAL MURDER STATUTE IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS BECAUSE IT FAILS TO ADEQUATELY NARROW THE CLASS OF PERSONS ELIGIBLE FOR THE DEATH PENALTY AND PERMITS ARBITRARY PROSECUTIONS AND CONVICTIONS

Petitioner alleges that there is an unconstitutional overlap between capital felony murder and first degree felony murder. This issue was decided adversely to petitioner in

*Simpson v. Lockhart,* 942 F.2d 493 (8th Cir. 1991).

This Court concludes that there is no merit to this issue.

## N. PETITIONERS RIGHTS UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS AND HIS RIGHT TO A FAIR TRIAL WERE VIOLATED BY THE STATE'S CONDUCT IN POSTING POLICE OFFICERS NEAR HIM AND SEATING THE VICTIM'S FAMILY ON THE FRONT ROW DIRECTLY IN FRONT OF THE JURY

Petitioner contends that the seating of the victims family in the front row of the courtroom and the use of a large number of police officers as security in the courtroom unfairly tainted his trial.

Prior to opening statements, and out of the presence of the jury, the prosecutor noted that there was "a certain group of victim's family members that probably ought to have those front rows." (T. 1151). Defense counsel objected to the special seating of the victim's family members. The Court stated that it was not going to interfere either way. (T. 1152). Shortly thereafter, a member of the prosecutor's office asked some people seated on the front row to move so that the victim's family could sit in those seats. This seating arrangement was maintained throughout the trial.

Petitioner also challenges his sentence based upon the placement and number of police officers in the courtroom. Mr. Rodgers, the prosecuting attorney, testified in hearings before this court as follows:

MR. RODGERS: My biggest concern was whether there was somebody out there that had a gun and was going to try to shoot me or try to shoot Kirt Wainwright. And that's why we wanted as many law enforcement officers there because there had been some threats made against me leading up to the trial and as in any case like this I'm sure there were people if they got the opportunity would try to harm him, and that was my primary concern was ensuring that the people involved in the trial were safe, including Mr. Wainwright.

MR. LAMBERT: How many officers do you recall were posted near Kirt at any one time?

MR. RODGERS: At what stage of the trial are you talking about?

MR. LAMBERT: At any stage of the trial.

MR. RODGERS: In the earlier stages of it—our courtroom is not as big as this one but it's set up similar to it. In the early stages we had so many of the law enforcement officers out of the courtroom under the rule I would just say there was probably two or three; that there was a row of chairs over behind the defendant's table similar as to what we have got over here and there maybe would be two or three there. When we got on further into the trial, particularly in the sentencing stage after he had been found guilty we may have had four, six or eight officers in the courtroom; and there would be some of those seated out in the audience, stationed at the back of it, and then, you know, some of them—I think there was generally one or two staying in the vicinity of Mr. Wainwright for the dual purpose of preventing him from trying to escape or harm anybody or taking a hostage or preventing anyone from trying to harm him.

This Court has also reviewed the testimony of Mr. Cochran, one of Mr. Wainwright's trial attorneys, during the hearings before this Court. From the record and from Mr. Cochran's testimony, it appears that during Mr. Wainwright's penalty phase testimony, two officers, one of whom was the sheriff, stood right beside or behind Mr. Wainwright. The trial court did state that these officers did not stand between the defendant and the jury, and in no way blocked the jury's view of Mr. Wainwright.

Respondent points out that the Arkansas Supreme Court addressed this issue on direct appeal:

Here, the appellant moved for a mistrial because two police officers stood near him during his testimony. The record shows that the trial court had the two police officers present to provide security throughout the trial, and that the officers were no closer to the appellant than they were during the rest of the trial. Unlike in *Moore*, here the officers never testified, and the court stated that a conscious effort was made to ensure the officers never blocked the jury's view of the appellant. The trial judge had the discretion to take security measures, and the measures in this case in no way resulted in prejudice to the appellant.

*Wainwright*, 302 Ark. at 385, 790 S.W.2d 420. Respondent urges this Court to defer to the state court's holding on the basis that a federal habeas court is bound to the factual findings by a state court unless it can reasonably conclude that the state court findings lacked fair support in the record.

The facts before this Court include the following:

1) Local newspapers were reporting that Mr. Wainwright was a member of the "Bloods" gang.

2) A bomb threat forced the trial court to dismiss the jury at approximately 2:30 p.m. one afternoon.

3) Thereafter, all persons entering the courthouse were subject to a metal detector search.

4) Many police officers were excluded from the opening stages of the trial because of the rule, indicating that these same officers may indeed have been witnesses or potential witnesses.

5) After Mr. Wainwright was found guilty, as many as eight police officers were present in the courtroom (during the penalty phase of the trial.)

6) Two officers, one of whom was the sheriff, accompanied Mr. Wainwright to the witness stand, stood in close proximity to him while he testified, and then escorted him back to his chair.

7) Members of the victim's family occupied the front row of the courtroom, directly to the side of, and close to, the jury, throughout the trial.

These facts and circumstances could have led the jury to believe that they were deciding the fate of an extremely dangerous individual.

This Court must defer to state court findings of fact unless they are not fairly sup-

ported by the record. This Court is unable to conclude that the security arrangements were excessive under the circumstances believed by the prosecution to exist, or that they were in any way intended to prejudice the petitioner. Nor can the Court conclude that the arrangements described likely prejudiced petitioner's right to a fair trial during the guilt phase. But, when coupled to the evidence tending to unfairly paint plaintiff as a member of a gang known as the "Bloods," during the penalty phase, see *infra*, the effect of these arrangements was, in fact, prejudicial to petitioner's right to a fair trial of that phase of the case, which phase was supposed to be based solely on the evidence of mitigating and aggravating circumstances as permitted by law. See discussion under Point "P" below. See also *Moore v. State*, 299 Ark. 532, 773 S.W.2d 834 (1989) (citations omitted). So, when taken in conjunction with the other factors listed *supra*, (gun powder residue evidence; impeachment regarding the gun) and *infra* (gang association) this Court concludes that the placement and number of police officers, the utilization of electronic searches, and the prosecution's role in placing the victims family in the front row of the courtroom resulted in substantial prejudice to plaintiff's right to due process during the penalty phase of the trial. Nevertheless the Court, on balance, concludes that the prejudice resulting from the security arrangements and the prosecution's removing spectators from the front row in the courtroom and placing the victim's family in those seats would not, taken alone, be a proper basis for holding that the penalty phase trial was fundamentally unfair. The Court simply cannot say that, absent those prejudicial circumstances, the jury would probably have imposed the penalty of life without parole rather than death.

O. **PETITIONER'S DEATH SENTENCE IS UNCONSTITUTIONAL UNDER THE EIGHTH AND FOURTEENTH AMENDMENTS DUE TO THE JURY'S INCONSISTENT FINDINGS ON THE MITIGATING CIRCUMSTANCE THAT HE DID NOT RESIST ARREST**

 ■ A review of the jury forms in the penalty phase of this case reveals that the jury made inconsistent findings on one of the submitted mitigating circumstances. The jury was provided with four forms relevant to mitigating circumstances. Three of the forms listed all of the mitigating circumstances. One form was to be filled out for the mitigating circumstances that the jury unanimously agreed probably existed at the time of the murder. The second form was to be filled out for the mitigating circumstances that one or more members of the jury believed probably existed at the time of the murder. The third form was to be filled out for those mitigating circumstances for which evidence was presented, but that the jury unanimously agreed did not exist at the time of the murder. Finally, form four was to be filled out only if the jury found that there was no evidence of any mitigating circumstances.

Mitigating circumstance # 7 stated: "That Kirt Wainwright did not resist when arrested for this crime." This circumstance was checked on both the form that stated that the jury unanimously agreed that the circumstance probably existed and on the form that stated that the jury unanimously agreed that the circumstance did not exist.

Petitioner contends that these inconsistent findings by the jury render Wainwright's death sentence unconstitutionally unreliable and violative of the Eighth and Fourteenth Amendments. Because Arkansas is a "weighing" state, the "whole question of the death penalty depends, under Arkansas law, on the jury's discretion in weighing aggravating against mitigating circumstances." *Woodard v. Sargent*, 806 F.2d 153, 157 (8th Cir.1986). Petitioner alleges that the inconsistent findings indicates confusion as to the existence of mitigating circumstances and thus reflects an absence of reasoned discretion on the part of the jury. Petitioner states that prejudice is presumed because if the jury unanimously found that the mitigating circumstance of lack of resistance existed, the balance of aggravating circumstances to mitigating circumstances would have stood at three to two and the jury might have concluded that the death penalty was inappropriate.

Respondent states that it is clear that the jury considered the mitigating circumstance at issue, even if there was some confusion. He further states that it must have been considered in the weighing process. When this is coupled with the jury's findings that all three submitted aggravating circumstances existed, respondent concludes that any alleged error is not prejudicial.

The Arkansas Supreme Court addressed this issue on direct appeal:

> Although the jury may have been inconsistent on this factor it was clear in unanimously finding that three aggravating circumstances existed at the time appellant committed the murder. On the other hand, even giving the appellant the benefit of the mitigating circumstance discussed above, the jury only determined that two mitigating circumstances existed. Upon individual polling, each juror stated that he or she had voted for the death penalty. Obviously, the jury found the aggravating circumstances outweighed those mitigating factors, and the trial court was correct in so holding.

*Wainwright*, 302 Ark. at 387, 790 S.W.2d 420.

This Court agrees with the Arkansas Supreme Court. There is no demonstration of prejudice in this case. In *Woodard*, the Eighth Circuit found that counsel was ineffective for failing to request the submission of a mitigating circumstance to the jury. No mitigating factors were found. 806 F.2d at 157. Thus, the Eighth Circuit found that the possibility that, if the jury had considered the mitigating circumstance, the verdict may well have been different and *Strickland* prejudice was established. *Id.* Here, it is clear that the jury did consider the relevant mitigating circumstance, although it is unclear how it was considered. The end result, however, shows that the jury considered it but found that the aggravating factors outweighed any and all mitigating factors and unanimously agreed to sentence petitioner to death.

This Court thus concludes that there is no merit to petitioner's argument on this issue.

**P. PETITIONER'S FIRST AND FOURTEENTH AMENDMENT RIGHTS WERE VIOLATED BY THE STATE'S IMPROPER PENALTY PHASE COMMENTS AND CROSS–EXAMINATION ABOUT PETITIONER'S ALLEGED INVOLVEMENT WITH THE BLOODS**

Petitioner claims that a line of cross examination questions concerning petitioner's alleged involvement with the "Bloods" violated his rights under the First and Fourteenth Amendments.

Prior to petitioner's trial, the State came into possession of various documents belonging to petitioner. One of those documents was a handwritten Islamic text referred to as "101". The front cover of this pamphlet was illustrated, and had the word "Blood" written in large letters across the front of it. A copy of the front cover is attached hereto as Appendix A. Petitioner took the stand at the penalty portion of his trial, and the State sought to question petitioner about this pamphlet, which the State referred to as the "Blood handbook." [4] A review of the record indicates that the prosecutor was under the mistaken impression that this pamphlet somehow tied petitioner to the "Blood" gang. The pamphlet itself was never introduced into evidence, although the record, and the testimony before this Court, indicates that the jury was able to see the front cover. The State's comments and questioning served to tie petitioner to the Blood street gang. Petitioner contends that these comments and questions unfairly prejudiced his penalty phase trial.

Respondent first argues that this issue was not properly presented to the state courts, and is therefore procedurally barred.

In a motion in limine before the beginning of the trial, defense counsel objected to allowing the State to present any evidence of "the fact that the defendant has been or is associated with any form of gang, more specifically the Bloods, the Crips, or any other

---

**4.** Before the penalty phase the prosecution stated that it intended "to inquire fully concerning his (petitioner's) beliefs, including his belief in the organization known as the Blood Gang" (T. 1984–85). This was objected to as irrelevant and inflammatory.

gang associated with unlawful activities." (T. 609). Defense counsel objected again when this issue was brought up during the penalty phase of the trial:

> DEFENSE COUNSEL: All right, now, the deal about the Bloods. It's totally irrelevant. It's totally unsupported.

> \* \* \* \* \* \*

> Further, Your Honor, in regard to the Bloods, we would ask the Court to note that it's not against the law to be a member of an organization. It's against the law to commit a crime, but not to be a member of the Bloods. That hasn't been proven anyway.

> \* \* \* \* \* \*

> Just for purpose of the record, Judge, specifically, we would make, or make specific objections to questioning on Bloods, and it is a constitutional right to belong to any organization, there is no proof, and the state can offer no proof that the Bloods are anything other than an organization, and not an illegal organization.

> THE COURT: No, however, I think there is, the Court has knowledge of the fact that there is some statement of Mr. Wainwright in one of his statements pertaining to his association with the Bloods, and they may inquire.

(T. 1987–94).

Furthermore, as the State continued to question Mr. Wainwright about the Bloods, attempting to introduce what the State was identifying as a "Blood handbook", defense counsel again objected:

> DEFENSE COUNSEL: Judge, again though, what relevance does this have, what relevance does anything [the prosecutor] has said for the past two hours have to do with aggravating circumstances?

> \* \* \* \* \* \*

> PROSECUTING ATTORNEY: Judge, there had been testimony by Mr. Wainwright and others, that his religious belief was Christian and he was of the Baptist religion and all his work activities in the Church, and I think we are entitled to offer some challenge to those beliefs.

> DEFENSE COUNSEL: He testified he studied a lot of others. Are you going to put in the Aryan Brotherhood or the Ku Klux Klan?

> PROSECUTING ATTORNEY: Well, we might, if there's anything, if he's got any beliefs on those lines.

(T. 2034–35).

As defense counsel's objection was included in his List of Objections and in the appendix to the brief, the Arkansas Supreme Court is presumed to have addressed the issue on the merits. *See* discussion of procedural bar, points A.II and G, *supra.* This issue is not procedurally barred.

Petitioner cites this Court to *Dawson v. Delaware,* 503 U.S. 159, 112 S.Ct. 1093, 117 L.Ed.2d 309 (1992). In that case, the Supreme Court held that the First and Fourteenth Amendments prohibit the introduction in a capital sentencing proceeding of the fact that the defendant was a member of the Aryan Brotherhood, where the evidence has no relevance to the issues being decided in the proceeding. *Id.* at 159–60, 112 S.Ct. at 1095. In *Dawson,* in exchange for the prosecution's agreement not to call any expert to testify about the Aryan Brotherhood, the defense agreed to the following stipulation:

> The Aryan Brotherhood refers to a white racist prison gang that began in the 1960's in California in response to other gangs of racial minorities. Separate gangs calling themselves the Aryan Brotherhood now exist in many state prisons including Delaware.

*Id.* at 162, 112 S.Ct. at 1096. The prosecutor read the stipulation to the jury and introduced evidence that Dawson had tattooed the words "Aryan Brotherhood" on his hand. *Id.* The Delaware Supreme Court stated that "[p]unishing a person for expressing his views or for associating with certain people is substantially different from allowing evidence of [the defendant's] character [to be considered] where that character is a relevant inquiry." *Id.* Therefore, the state court concluded, because the evidence relating to the Aryan Brotherhood focused the jury's attention on Dawson's character and did not appeal to the jury's prejudices concerning race,

religion, or political affiliation, it was properly admitted. *Id.*

The United States Supreme Court reversed. While finding that the Constitution does not erect a per se barrier to the admission of evidence concerning one's beliefs and associations at sentencing simply because those beliefs and associations are protected by the First Amendment, the Court found that the admitted evidence was totally without relevance to Dawson's sentencing proceeding:

> Even if the Delaware group to which Dawson allegedly belongs is racist, those beliefs, so far as we can determine, had no relevance to the sentencing proceeding in this case. For example, the Aryan Brotherhood evidence was not tied in any way to the murder of Dawson's victim. In *Barclay* [*v. Florida*, 463 U.S. 939, 103 S.Ct. 3418, 77 L.Ed.2d 1134 (1983) ], on the contrary, the evidence showed that the defendant's membership in the Black Liberation Army, and his consequent desire to start a "racial war," were related to the murder of a white hitchhiker ... We concluded that it was most proper for the sentencing judge to "take[e] into account the elements of racial hatred in this murder." ... In the present case, however, the murder victim was white, as is Dawson; elements of racial hatred were therefore not involved in the killing.
>
> Because the prosecution did not prove that the Aryan Brotherhood had committed any unlawful or violent acts, or had even endorsed such acts, the Aryan Brotherhood evidence was also not relevant to help prove any aggravating circumstance. In many cases, for example associational evidence might serve a legitimate purpose in showing that a defendant represents a future danger to society. A defendant's membership in an organization that endorses the killing of any identifiable group, for example, might be relevant to a jury's inquiry into whether the defendant will be dangerous in the future. Other evidence concerning a defendant's association might be relevant in proving other aggravating circumstances. But the inference which the jury was invited to draw in this case tend to prove nothing more than the ab-

stract beliefs of the Delaware chapter. Delaware counters that even these abstract beliefs constitute a portion of Dawson's "character" and thus are admissible in their own right under Delaware law ... Whatever label is given to the evidence presented, however, we conclude that Dawson's First Amendment rights were violated by the admission of the Aryan Brotherhood evidence in this case, because the evidence proved nothing more than Dawson's abstract beliefs ... [o]ne is left with the feeling that the Aryan Brotherhood evidence was employed simply because the jury would find these beliefs morally reprehensible.

*Id.* at 166–67, 112 S.Ct. at 1097–98.

With *Dawson's* principles in mind, let us look at precisely how the record was developed in this case concerning Mr. Wainwright's alleged involvement with the Bloods. As the overall context is important, we quote at length:

BY THE PROSECUTING ATTORNEY (Questioning Mr. Wainwright):

Q Now, you said that you, basically, were a Baptist or a Christian.

A That's right.

Q But you have read some other religious literature.

A That's right.

A I said I had studied, yea, I read some, too.

Q Studied some?

A Right.

Q I will show you this document, and ask if you recall having ever seen this?

A Yes, I have.

Q And what is that?

A That's more Science Temple religious material, the Muslims.

Q This belongs to you?

A That's right.

Q And it's yours?

A That's right.

Q Does this have anything to do with Christian religion, or being a Baptist?

A No, this is Islamic material.

Q It's what?

A Islamic material.

Q This, is this what you refer to the Blood handbook?

A No, that's some more Science Temple of America. Matter of fact, that come out of a book called 101.

Q What is the Bloods?

A What is the blood? That means black. Blood means black.

Q But this envelope here and this document is your literature?

A Right.

PROSECUTING ATTORNEY:

Judge, we ask that this be marked and admitted, having been identified by the defendant.

DEFENSE COUNSEL:

What is the relevant issue?

PROSECUTING ATTORNEY:

Judge, I think it goes to his testimony and the testimony of the ministers as far as his being of the Christian faith. I think this certainly, is proper rebuttal on that point.

THE COURT:

As to relevancy, the objection is overruled.

DEFENSE COUNSEL:

Your Honor, he testified he has read these items. I don't see what relevance that has. He has not testified he subscribed, or anything, I don't even know what that is.

PROSECUTING ATTORNEY:

Your Honor, it's been in the discovery material for four months.

DEFENSE COUNSEL:

Judge, again though, what relevance does this have, what relevance does anything Mr. Rodgers has said for the past two hours have to do with aggravating circumstances?

PROSECUTING ATTORNEY:

If we are going to approach, I would like to approach the bench, Your Honor.

THE COURT:

Overruled.

PROSECUTING ATTORNEY:

Judge, we ask that State's T–75 be admitted.

THE COURT:

Let it be admitted.

DEFENSE COUNSEL:

Your Honor, may I ask what ground, or what purpose that is admitted?

THE COURT:

I think we have just stated that.

PROSECUTING ATTORNEY:

Q. Do you subscribe . . .

THE COURT:

Restate that.

PROSECUTING ATTORNEY:

Judge, there had been testimony by Mr. Wainwright and others, that his religious belief was Christian and he was of the Baptist religion and all his work activities in the Church, and I think we are entitled to offer some challenge to those beliefs.

DEFENSE COUNSEL:

He testified he studied a lot of others. Are you going to put in the Aryan Brotherhood or the Ku Klux Klan.

PROSECUTING ATTORNEY:

Well, we might, if there's anything, if he's got any beliefs on those lines.

THE COURT:

He has identified it as his.

BY THE PROSECUTING ATTORNEY:

Q Do you subscribe to the beliefs that's set in State's Exhibit T–75, apparently the title being Blood?

A No, the title is Science Temple of America, but no, I do not subscribe to it.

Q You do not subscribe to those beliefs?

A No.

Q You do not believe in the precepts set out in this document?

A No.

PROSECUTING ATTORNEY:

Judge, before I ask, I would like . . .

DEFENSE COUNSEL:

I would like that to be withdrawn. It's of no relevance whatsoever. Are we going to let his dog in issue?

THE COURT:

Make your motion. As to the response, I will sustain the withdrawal.

PROSECUTING ATTORNEY:

Judge, I want to inquire further in, one, I want to ask him whose handwriting that is in, and two, I want to ask him concerning the statement that he made to Lt. Duvall on July 31st, at 8:47, about whether he advised Lt. Duvall that he could not tell him the location of the crack house, because it would be in violation of the code of the Blood.

THE COURT:

I will disallow that. I will disallow that. You still may, inasmuch as he has identified that, ask him whose handwriting it is in, it's just not in evidence. I have sustained it, withdrawn it from the jury.

PROSECUTING ATTORNEY:

And, Your Honor, at this time, we would agree to the defendant's motion that reference to the Blood gang membership not be further inquire (sic) into.

THE COURT:

Right. He's already denied any association with it, and the matter is over on that issue. It is closed. You can ask him whose handwriting, if he knows whose handwriting.

BACK

Q Mr. Wainwright, do you know whose handwriting this is?

A It's not my art work, but it's my hand writing.

Q This entire document other than the art work is your handwriting?

A Yes, sir.

PROSECUTING ATTORNEY:

Judge, again, we would offer it.

THE COURT:

Continued, granting your motion.

T–75 WITHDRAWN

(T. 2032–37).

The item being referred to above is a handwritten verbatim copy of an Islamic religious text. As discussed above, this item,

referred to shorthandedly as "101", is one-hundred and one questions and answers about the Islamic faith and is taken directly from a booklet entitled "Koran Questions for Moorish Children". Mr. Wainwright's copy has a hand-drawn front-cover which has a crescent moon with the number seven on it, a star next to the moon, a dagger, and the word "Blood" written in large letters across the front.

It seemed to this Court that the prosecuting attorney had some confusion as to the difference between a well-known violent street gang and a text of religious beliefs. It was also not entirely clear to this court what exactly was actually shown to the jury. So inquiry was made.

Mr. Rodgers, the prosecuting attorney at trial, testified at some length in the hearings before this Court about his understanding of the booklet, its relationship to the "Bloods", and how this evidence "rebutted" evidence that Mr. Wainwright was a Christian. Again, for the sake of context, the Court will quote at some length from that testimony.

THE COURT: In looking at your evidence in the case, do you ever recall having seen anything that linked the defendant to the Bloods gang or that was a code or creed of the Bloods?

THE WITNESS: In looking in the case file, I had some information on that, but as far as the evidence that was presented in the case at trial I don't know that there was anything about the Bloods other than—

THE COURT: What was in the case file about the Bloods? Do you know or do you remember?

THE WITNESS: The only thing I remember is during the sentencing stage that I made some notes here from my notes that Kirt and his uncle, Reverend Albert Butler, mother, Reba Nixon, and then Reverend Eugene Toney and two Catholic priests that testified more or less to establish that Kirt was a Christian and a Baptist and they presented considerable evidence in the sentencing stage to the effect that he was a Christian and a Baptist. And to rebut that and to cross-exam-

ine him I asked him about this little old booklet that had a drawing of a dagger or something on the front of it and said "blood" and from what I remember we had discussed that previously with the judge out of the hearing of the jury and he had determined that it wouldn't anything about that be admissible unless there was something come up that made it admissible. And as far as I can remember—and again without seeing the transcript—I think after they presented all of their evidence about him being a Christian and a Baptist and how active in the church he was and his own testimony on that point that out of the hearing of the jury we approached the judge and said that we believed that we should be able to go into this to rebut this evidence about what an active Christian he was. And the Judge permitted some limited inquiry and, as I recall, he was seated on the witness stand and I was here and the jury was over there and we were taking precautions to make sure that the jury didn't see anything other than the fact that we had the booklet and if—I don't even know where the original—but if I remember, the back side of it was just a blank page and I had approached Kirt and showed him the booklet and he identified it as the artwork and the writing in it being his. And from there seems like there was something about we were inquiring into it and he stated that that was his or was his handwriting, he had written it, but he did not believe what was written in it. And at that point the examination was terminated and there was no further effort to get it in. That's what I remember about it; that we were not able to really get into the booklet because while he did acknowledge that it was his writing he indicated that he didn't believe what was written in it.

And if he had indicated that he had, it was my understanding the Judge was going to let us go into the booklet because the booklet contained things that was inconsistent with his and his witnesses' testimony that he was a Christian, Baptist. But when he said he didn't believe what was in it, if I remember that terminated the inquiry.

THE COURT: What I'm wondering, what is there in what you have in your hand that is inconsistent with his statement that he's a Baptist and a Christian?

THE WITNESS: Well, let's see. The whole booklet is inconsistent with him being a Christian.

THE COURT: Why?

THE WITNESS: Well, because I'm a Christian and I know how Christians believe.

THE COURT: If you read the Koran would you be less of a Christian?

THE WITNESS: I don't think reading it, but saying you believe it you would be.

THE COURT: Where did he say he believed it.

THE WITNESS: Here on this one page: "What is your religion?" "Islam." That right there would negate him being a Christian.

The Court notes that Mr. Rodgers is referring to language in the booklet itself, which is simply a series of questions and answers. There is no declaration to the effect that "I, Kirt Wainwright, believe or adopt the following questions and answers as my own." Thus, it appears that Mr. Rodgers was under the impression that the statements in the booklet, because they were written in the first person, reflected Mr. Wainwright's personal views. This confusion is further evident from the following colloquy:

THE COURT: Did you ever look at this what he referred to as 101?

THE WITNESS: 101?

THE COURT: Yeah. His answer to your question here about: "This—is this what you refer to the Blood handbook?" And his answer was: "No, that's some more Science Temple of America. Matter of fact, that comes out of a book called 101."

THE WITNESS: I don't know what 101 is.

THE COURT: It's been testified here and another exhibit is in evidence that those questions and answers are a catechism for the Koran. They are taken verbatim from a publication, I guess, of the Islamic people put out on their beliefs. It's kind of a simplified statement of questions and an-

swers about the beliefs of Islam. And, in other words, he has hand-written out, according to this other exhibit which is 101 the booklet, all those are questions and answers where he has just copied in his own handwriting.

Now, I guess this to me when you ask him—the front page of that has a dagger dripping with blood and it has the word "blood" on it, doesn't it, or Bloods?

THE WITNESS: Yes, sir.

THE COURT: And you had that in your hand.

THE WITNESS: Now that may have been the envelope since you've read this transcript. This may have been the envelope that it was in here. This would be the cover of it.

\*　　\*　　\*　　\*　　\*　　\*

THE COURT: Did anyone ever tell you they had a booklet or anything about the Blood gang or any gang that he was associated with? I know there was some warnings, I gather, that the sheriff read or heard about that the Bloods were going to come into town and might cause trouble and security was beefed up.

THE WITNESS: Yes, sir.

THE COURT: Did you have any evidence that he was a member of a gang, a Blood gang?

THE WITNESS: Just what's been mentioned here.

THE COURT: Just what's here.

THE WITNESS: Well, the reports that we received and, of course, there were, I think the week before we began jury selection—this was at a time when probably crack cocaine use was nearing its peek in Nevada County, and I believe it's the week before this trial began as far as something to indicate to me that there may have been concern with the Bloods or Islamism or some of his sympathizers trying to do something. There was one day a black individual come into my office and brought me a message from the Lord, and I had sent him out sometime earlier and told him not to come back. And he brought me a message from the Lord, and I sent one back to the Lord by him. And I found out

that that same day during noon he had went in to the municipal judge's office, Duncan Culpepper, during the noon hour right before he come to my office and about scared his secretary to death because he brought Judge Culpepper a message from the great "I Am," whoever that is, and they all were along the lines of that we were to not prosecute any more of their innocent people; and the person who come in, I understood or had intelligence, was a crack head that apparently was a friend or sympathizer of Mr. Wainwright and had a brother that we had just recently sentenced to the penitentiary for dealing crack cocaine and had one or more sisters that were crack addicts that had been arrested.

And when this person that I knew to be a crack head was black and come into my office the first time—when he come back the second time bringing me a message from the Lord and I found out about the message he carried to the municipal judge from the great "I Am", I felt like to me with it being publicized that we were going to start the next week picking his trial I felt like that was evidence enough to me that there was some of these Bloods or Islams or whatever in there that was going to try to get Kirt out of jail and/or prevent me from doing my duties as a prosecuting attorney that, you know, I took the necessary precautions myself because I have found that if you let these people intimidate you on something like that you might as well hang up and quit.

THE COURT: So there was sort—.

THE WITNESS: So I was convinced before we started his trial that, based on the information I had and from my personal concern, I was convinced that he had connections to the Bloods or Muslims, Islams or whatever; some black-oriented group that if they got the opportunity would do harm or threat or intimidate me to try to keep me from prosecuting him, and I acted accordingly.

\*　　\*　　\*　　\*　　\*　　\*

THE WITNESS: Well, all the information that I had as far as this booklet and the

reports that was received to the sheriff's office and that statement, I feel like there was some merit to the belief that he was a member of the Blood.

\* \* \* \* \* \*

THE COURT: Is it your understanding that people that believe in Islam are essentially part of the Blood gang?

THE WITNESS: No, sir. My understanding from this booklet and other information that I have got is the Bloods are a fragmented—a portion of the Islam or Muslim, but I don't know. I'm a Christian. I understand the Christian religion. I don't know much about Islamism or Muslims. I learned more from what I read in this booklet.

\* \* \* \* \* \*

THE COURT: Well, I guess what I'm really worried about here is the very concerns you're expressing or the same concerns I think any juror would be worried about and that I would be worried about and what are we dealing with here. A man who lives in Nevada County who walks into a store and kills someone, are we dealing with tentacles of a large operation or criminal group who are invading our country and invading this state and getting people involved in crack?

THE WITNESS: No, sir I wasn't looking at it from that standpoint at all. What I was looking at it from is if Mr. Wainwright is a Christian or a Baptist, then I would expect him to say that he is. Whatever his religion is, I wouldn't expect him to deny it and I wouldn't expect anyone to misrepresent their religious beliefs.

THE COURT: Do you have anything that indicates that he did?

THE WITNESS: Yes, sir.

THE COURT: What?

THE WITNESS: This book.

THE COURT: Why is that—when he says "I'm a Christian, but I read other religions. I keep literature. I study other religions" why is that book inconsistent with his statements these he's a Christian and a Baptist, just on the face of it that he wrote out and copied the 101 questions and answers from the Islamic—

THE WITNESS: There is a question here: "What is your religion?" Answer: "Islamism." But, of course, they go: "Who was Jesus" and the response to that is inconsistent with the Christian beliefs on it.

THE COURT: Oh, I'm sure. The Islamic religion is not consistent with the Christian religion. There's no question about it. I guess if you looked—

THE WITNESS: That's my concern is why, if he was Islamic or whatever, why would he and his witnesses get up and devote so much time to telling the jury that "I'm a Christian" and "I'm a Baptist".

THE COURT: Let's put it the other way. He's a Christian and a Baptist. Why—you didn't know until today, I gather, that what is copied there is a verbatim copy of a hundred one questions from a publication known as "101 Principles of Islam".

THE WITNESS: The only thing I knew about this is what I was able to elicit from Kirt Wainwright in the record of this case. I had never had an opportunity to discuss it with him prior to then and I didn't know anyone else that was familiar with this.

\* \* \* \* \* \*

THE COURT: It's clear that you had that material in your hand. It's clear, it seems clear to me that you had to show him both the front page and the handwriting so that he could say whether he drew it or it was in his writing. And your jury box is the same relationship to the witness stand as ours is here?

THE WITNESS: Yes, sir.

The Court notes that the testimony of Mr. Cochran indicates, and the Court so finds, that the jury was able to view the front cover of the booklet, with the word "Blood" on it, even though the document was never admitted into evidence. In fact, Mr. Cochran testified that he thought that at some point during this "rebuttal" cross-examination about the Bloods, Mr. Rodgers had placed the booklet on the jury-box rail. Mr. Rodgers himself testified that he did not believe that this occurred. Even if the booklet had not actually been placed on the rail, it is clear

618

to the Court that Mr. Rodgers was beside or in front of Mr. Wainwright with the material in his hand. The jury saw it and knew that it was handwritten by petitioner. It appears to this Court that the overall effect was worse than it would have been had the booklet actually been received in evidence. Had it been received the jury would have seen that it was simply a catechism of Islamic beliefs. The sinister inference that it might be a "Blood Gang" handbook would have been undercut.

Mr. Rodgers went on to solidify his view that there was some link between the Bloods gang and the Islamic church:

THE WITNESS: I didn't really know what it was. You know, I know what you're understanding of the Bloods is but as far as—

THE COURT: I think the general public believes like the Bloods and the Crips they are a bunch of gangs around the country and engaged in illegal—mainly drug business and killing people.

*　　*　　*　　*　　*　　*

THE COURT: ... Now, the jury never saw the handwriting and they never saw, as I understand what—they never had any idea what it says. If they saw anything, it occurs to me, it would be the picture of the dagger. Now I'm making some surmise there. Even if it was in an envelope you had to show him both so he could make some statement about why they were in his handwriting. And if he says that the writing is in his handwriting and the art work is not, do you see any problem? We had the motion in limine about not getting into gangs.

We have you asking him about the Bloods and kind of the unusual circumstance was the defense was objecting to the document. It ends up with the jury knowing that there is such a document. It's in his handwriting, there's something about it refers to Blood. It's not a Blood handbook, according to the testimony of the witness, and then in effect the motion is sustained so they never get to read it. They never really look at it as an exhibit.

What has been the effect on the jury of this—of what happened here? Do you have any idea? Any suggestion that they are being led to believe that he is a member of the Blood gang or of a gang known as the Bloods?

*　　*　　*　　*　　*　　*

THE WITNESS: I'm not going do try to mislead the Court. At the time I questioned Mr. Wainwright about this booklet, I felt in my heart that he was a member of the Bloods and that's what I was trying to get out to challenge his testimony and other evidence that he was a Christian. And, of course, the whole booklet to me—like I said, I'm not a believer of Islam and I may not understand this any more than a non-Christian has problems understanding the Holy Bible; but reading all of it, when I got down toward the end of it on what I've got here it shows page 234 of 344 pages, it says—to me the whole booklet is inconsistent with Christian faith. But says: "What title does satan give himself?" "God." "Will you define the word white?" "White means purity. Purity means God. God means the ruler of the lands."

To me, that was equating Christian God with Satan, and it was equating white people to Satan. And that was consistent with my thinking that he was a member of the Blood gang because I felt like from reading this if he was a member of the Blood gang that he looked upon Christian God as being Satan and as white people being Satan and that's where I was heading the inquiry. And the Court, when he denied believing what was in here, limited that inquiry because he had denied Islam and denied what's in this booklet and I don't know whether he denied it because he didn't believe it or whether he denied it because he was smart enough to think that was the right thing to do or what his lawyers had told him that.

But in my opinion he made a wise decision by did denying what was in here and I felt like and intended—if he had said that I believe what is in this book, I had every intentions of offering it into evidence and Cross-examining him to indicate that.

*　　*　　*　　*　　*　　*

THE COURT: It would be directly challenging his statements that he is a Christian?

THE WITNESS: But that was my whole purpose in it because they had put in so much evidence about him being a Christian and a Baptist and as the Court might have detected, I'm rather sensitive on that matter.

THE COURT: Are you a Baptist?

THE WITNESS: Yes, sir.

 It is very clear to this Court what happened here. Not only did the prosecutor feed upon what he admits was a sort of "gang hysteria" in the community at the time, but he sincerely bought into it himself. He got the idea in his head that this religious text was tied in some way to a notorious street gang, that Mr. Wainwright was a member of this dual-purpose organization (or that Mr. Wainwright believed himself to be such a member) and that Mr. Wainwright then had the temerity to get on the stand and state that his religious beliefs were the same as those of the prosecutor.

The cross-examination of Mr. Wainwright did not serve any proper rebuttal purpose. It tended strongly to link Mr. Wainwright to a street gang and to generate in the jury the fear of gangs, thereby making Mr. Wainwright himself appear more dangerous and threatening. Mr. Wainwright's testimony that he was a Baptist and a Christian in no way opened the issue of gang membership.

At some point during the hearings before this Court, Mr. Wainwright was asked if Mr. Rodgers ever actually used the word "gang" when questioning him at trial. Mr. Wainwright's answer has the ring of truth: "He didn't have to."

 There was no evidence that the murder of Ms. Smith was in any way gang-related, or tied to the "Bloods". Furthermore, this evidence was not relevant to any aggravating circumstance alleged by the state. Its prejudicial effect is manifest. The Court is convinced that this evidence led the jury to believe that it was dealing with a larger criminal enterprise, not just a local convenience store murder. The Court is convinced that the penalty imposed would

probably have been life without parole absent this prejudicial circumstance. The cross-examination was improper, and under the principles set forth in *Dawson v. Delaware*, violated Mr. Wainwright's First and Fourteenth Amendment rights. His death sentence cannot stand in light of such a violation, and must therefore be set aside.

Q. PETITIONER IS ENTITLED TO RELIEF UNDER THE CUMULATIVE ERROR DOCTRINE

 Petitioner's final contention is that even if each individual error set forth above is insufficiently egregious standing alone to justify granting relief to Wainwright, their cumulative effect clearly is sufficient. Petitioner states that there is a split in the Eighth Circuit, with two different panels coming to opposite conclusions on the viability of a cumulative error doctrine. In *Harris v. Housewright*, 697 F.2d 202, 206 (8th Cir. 1982), the Eighth Circuit reviewed a capital murder case where recent law school graduates were appointed to a capital murder case with insufficient experience. In that case, the court concluded:

No single error made by the petitioner's appointed counsel is of constitutional dimension. Yet, when viewed cumulatively, the multiple errors revealed in the record, as discussed below, demonstrate that counsel's total performance was below the level of professional skill customary for competent counsel similarly situated.

*Id.* at 206. Thus, at least one panel of the Eighth Circuit has granted relief for cumulative error under the rubric of ineffective assistance of counsel.

However, the Eighth Circuit has also addressed the concept of cumulative error in habeas cases when it is not limited to establishing ineffective assistance:

This Court has said that cumulative error does not call for habeas relief, as each habeas claim must stand or fall on its own. *Byrd v. Armontrout*, 880 F.2d 1, 11 (8th Cir.1989) (quoting *Lee v. Lockhart*, 754 F.2d 277, 279 (8th Cir.1985), *cert. denied,*

494 U.S. 1019, 110 S.Ct. 1326, 108 L.Ed.2d 501 (1990)).

*Scott v. Jones,* 915 F.2d 1188 (8th Cir.1990).

It appears that there is not a split in the Circuit, but that the Circuit is willing to recognize that cumulative counsel errors can constitute ineffective assistance of counsel, but obviously does not recognize that cumulative trial errors can constitute an unfair trial. This seems an illogical distinction. Trial errors do not operate in a vacuum. In this case, a number of factors individually insufficient for constitutional error may have operated together to create an unfair sentencing phase trial. Here, the pretrial and trial publicity indicated that petitioner was a gang member, although we know that there is scant, if any, evidence to support that contention. *See* discussion under point heading "P", *supra.* Most members of the jury had been exposed to pretrial publicity, and may have been exposed to this gang misinformation. There was a bomb threat in the middle of the trial. After the bomb threat, everyone entering the building was subjected to a metal detector search. A key witness committed perjury with respect to petitioner's possession of a weapon at the scene of the crime. The evidence revealed that Mr. Leeper had gun powder on his hand while petitioner did not. The security arrangements and the placing of the victim's family members in the front row near to the jury prejudiced petitioner. The failure of petitioner's attorney to insist on adequate funds for a ballistics expert resulted in prejudice to petitioner. Finally, and most egregariously, the prosecution's questioning petitioner about the "Bloods" pamphlet at the penalty phase clearly prejudiced petitioner's right to

a fair determination of the issues at the penalty phase. The cumulative effect seems obvious. If the cumulative error theory were in effect in this Circuit then this would be a clear case for its application. We can say this because if none of these prejudicial errors or circumstances had occurred, it is very probable that the outcome of the penalty phase of this trial would have been different.

Nevertheless, this Court is bound by the Eighth Circuit's holdings. Although this Court believes that the Eighth Circuit should reexamine its position on cumulative error, it has not yet done so. This Court is thus foreclosed from granting relief on the cumulative effect argument. There is, of course, a difference between an attempt to cumulate independent non-reversible grounds on the one hand and putting a serious error in context on the other.

## CONCLUSION

This Court concludes that Mr. Wainwright's death sentence cannot stand and must be set aside. His conviction for capital murder remains intact.

The Court will order a new sentencing trial to be commenced within 120 days of this order, or the Writ of Habeas Corpus shall issue mandating a sentence of life without the possibility of parole.

IT IS THEREFORE ORDERED that the Amended Petition for Writ of Habeas Corpus be, and it is hereby, GRANTED. The State is given 120 days within which to commence a new sentencing trial; otherwise the Writ shall issue mandating a sentence of life without the possibility of parole.[5]

---

**5.** The Court wishes to acknowledge the exceptionally high quality and the thoroughness of petitioner's counsels' work in this case.

APPENDIX A

EXHIBIT J

SALVATION EL's

ALLAh might

M.S.T. of A.

UNITY Bey's

Prophet Noble Drew Ali

Blood

UMAR

Rahman

Muhammad Boy

PLAN

## JUDGMENT

Upon the basis of the Memorandum Opinion of even date herewith,

IT IS CONSIDERED, ORDERED AND ADJUDGED that the Amended Petition for Writ of Habeas Corpus be, and it is hereby, Granted with respect to the penalty phase of Petitioner's trial.

IT IS FURTHER ORDERED that the Writ will issue mandating a sentence of life without the possibility of parole unless the State notifies this Court within 60 days of this date of its intention to retry the penalty phase and unless such new sentencing trial commences within 120 days of this Order.